STATE OF NORTH CAROLINA v. WILLIAM LEROY BARNES, ROBERT LEWIS
BLAKNEY, FRANK JUNIOR CHAMBERS

No. 146A94

(Filed 10 February 1997)

**1. Criminal Law § 76 (NCI4th Rev.)— capital murder—motion for change of venue—pretrial publicity—no showing of particular objection to individual juror**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery by denying defendants' motion for change of venue based upon pretrial publicity. While at least nine sitting jurors had been exposed to pretrial publicity and defendants exhausted all of their peremptory challenges, no defendant specifically identified a single juror who was objectionable to him. The jurors at issue each stated unequivocally that they would be able to arrive at a determination of defendant's guilt or innocence based solely upon the evidence presented at trial and defendants have not offered particular objections to any individual juror. Defendants have not shown any specific and identifiable prejudice necessitating a change of venue.

**Am Jur 2d, Criminal Law § 378.**

**Right of accused in misdemeanor prosecution to change of venue on grounds of inability to secure fair trial and the like. 34 ALR 3d 804.**

**2. Criminal Law § 76 (NCI4th Rev.)— capital murder—motion for change of venue—pretrial publicity—general prejudice against defendant**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery by denying defendants' motion for a change of venue based on the county's population being infected with prejudice against defendants. Several factors distinguish this case from *State v. Jerrett*, 309 N.C. 239, and *Sheppard v. Maxwell*, 384 U.S. 333; Rowan County does not constitute the small "neighborhood" type of environment at issue in *Jerrett*, none of the seated jurors possessed any preconceived notions about the guilt or innocence of the defendants, although a number had heard about the case; the level of

familiarity that the *Jerrett* jurors had with the victim, the victim's family, and the State's witnesses is not present in this case; and the proceedings here were not merely a sideshow to the larger carnival of public spectacle. Viewing the totality of the circumstances, there is not a reasonable likelihood that pretrial publicity prevented defendants from having a fair trial.

**Am Jur 2d, Criminal Law § 378.**

**Right of accused in misdemeanor prosecution to change of venue on grounds of inability to secure fair trial and the like. 34 ALR 3d 804.**

**3. Criminal Law § 78 (NCI4th Rev.)— change of venue—pretrial publicity—jurors' ability to rely solely on evidence presented at trial**

Although defendant contends that *State v. Moore,* 335 N.C. 567, *cert. denied,* 130 L. Ed. 2d 174 (1994) (holding that the trial court does not err by denying a motion for change of venue when each juror states unequivocally that he or she can set aside what was heard previously about defendant's guilt and arrive at a determination based solely on evidence presented at trial) violates *Murphy v. Florida,* 421 U.S. 794 (1975) (holding that jurors' assurances that they are equal to the task of setting aside preconceived notions about a case cannot be dispositive of the accused's rights), our appellate courts have the power to consider the evidence and the totality of the circumstances in determining whether the trial court has erred in resolving such a motion. The most persuasive evidence as to whether pretrial publicity was prejudicial or inflammatory usually will be the jurors' responses to questions asked them during jury selection. Absent some reason to doubt jurors' unequivocal statements that they will rely solely on the evidence presented in determining the outcome of the trial, the North Carolina Supreme Court has no need to further examine the validity of the trial court's ruling.

**Am Jur 2d, Jury §§ 193, 289; Trial § 1546.**

**4. Jury § 106 (NCI4th)— capital murder—jury selection—motion for individual voir dire denied**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery by refusing to allow individual voir dire of prospective jurors. Any error was harmless because the trial judge told defense counsel at the

beginning of the proceeding that, while his practice was to deal with jury selection a panel at a time, he would entertain arguments on individual voir dire and would be glad to keep an open mind on the issue. Defendants have failed to identify any possible particular harm resulting from their being required to question each of the jurors in the presence of the others.

**Am Jur 2d, Jury §§ 194, 198.**

**5. Jury § 243 (NCI4th)— capital murder—jury selection— additional peremptory challenges denied**

The trial court did not err in a capital prosecution for first-degree murder, burglary, and robbery by denying defendants additional peremptory challenges. The court allowed each defendant an additional peremptory challenge because one juror who had been accepted by all parties was dismissed because of a family emergency. Defendants therefore enjoyed the use of a total of forty-five peremptory challenges, more than the statutory provision allows.

**Am Jur 2d, Jury §§ 235, 236.**

**Jury: number of peremptory challenges allowed in criminal case, where there are two or more defendants tried together. 21 ALR3d 725.**

**6. Jury § 248 (NCI4th)— capital murder—peremptory challenges—alleged racial discrimination—State's reasons sufficient**

The trial court in a capital prosecution for first-degree murder, burglary, and robbery did not allow the State to exercise three peremptory challenges in a racially discriminatory manner where the trial court ruled that defendants failed to make a *prima facie* showing of racial discrimination but asked the district attorney to state his reasons for excluding the jurors. Even if answers of a venire member who is later peremptorily excused are similar to those of a juror of another race who sits in judgement of a defendant and the manner of questioning differs, this does not necessarily lead to a conclusion that the prosecutor's reasons were pretextual. It cannot be said that the trial court's rulings were clearly erroneous in light of the totality of the circumstances.

**Am Jur 2d, Jury § 244.**

STATE v. BARNES

[345 N.C. 184 (1997)]

Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.

**7. Evidence and Witnesses § 1756 (NCI4th)— capital murder—mannequins—illustrative of number and direction of bullet wounds**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery by allowing the use of mannequins for the purpose of illustrating the number and direction of bullet wounds incurred by the victims. Although defendants argued that the demonstration was both cumulative and prejudicial, the evidence presented with respect to the killings was complex and the three dimensional evidence involving the mannequins and dowels was undoubtedly helpful to the jury in resolving and understanding these complex issues. The evidence concerning the bullet paths was also probative with respect to premeditation and deliberation, as the nature and number of a victim's wounds and whether the wounds are inflicted after a victim has been rendered helpless are circumstances to be considered in this determination.

**Am Jur 2d, Homicide § 415.**

Propriety, in trial of criminal case, of use of skeleton or model of human body or part. 83 ALR2d 1097.

**8. Evidence and Witnesses § 1130 (NCI4th)— hearsay—codefendants' statements—admissible**

The trial court did not err in a capital prosecution for first-degree murder, burglary, and robbery, by admitting hearsay statements by two codefendants against defendant Barnes. Blakney's conversation with Valerie Mason tended to subject him to criminal liability, and he no doubt knew the consequences of acknowledging his involvement in an attack on a law enforcement officer. His statements therefore fit within the hearsay exception in N.C.G.S. § 8C-1, Rule 804(b)(3). Moreover, without ruling on any issues concerning the scope of North Carolina's Rule 804(b)(3) hearsay exception, Blakney's comments do not have the taint of "special suspicion" reserved for those statements aimed at implicating another defendant while exonerating the declarant and therefore do not violate the rule of *Williamson v. United States*, 512 U.S. 594.

**Am Jur 2d, Homicide § 345.**

STATE v. BARNES

[345 N.C. 184 (1997)]

**9. Evidence and Witnesses § 1123 (NCI4th)— hearsay statements by coconspirator—admissible**

The hearsay statements of defendant Blakney, admitted in the capital trial of three defendants for first-degree murder, burglary, and robbery, fit within the exception for statements of a coconspirator found in N.C.G.S. § 8C-1, Rule 801(d)(E). It is not necessary for the prosecution to establish the existence of the conspiracy before the admission of a hearsay statement falling within this exception as long as the existence of the conspiracy is eventually established. The jury could find from the evidence that defendants' conduct up to and including the robbery was part of a conspiracy, that the subsequent actions of defendants were in the course of and in furtherance of the conspiracy, as Blakney's remarks and the actions of defendants were designed to conceal their involvement in the crimes.

**Am Jur 2d, Homicide § 346.**

**Admissibility of statements of coconspirators made after termination of conspiracy and outside accused's presence. 4 ALR3d 671.**

**10. Evidence and Witnesses § 1134 (NCI4th)— hearsay statements of coconspirator—Bruton distinguished**

The trial court did not err as to defendant Barnes in a capital prosecution for first-degree murder, burglary, and robbery by admitting the statement of codefendant Chambers that "I shouldn't have gone with them." The statement was not powerfully incriminating in the context of the evidence against defendant Barnes; the reference to "them" was not made in the context of any specific statements about the killings and the trial court cautioned the jury with respect to the statement. The situation in this case is distinguishable from *Bruton v. United States*, 391 U.S. 123. Chambers' statements did not clearly identify Barnes or create a substantial risk that the jury would ignore the trial court's instructions in its determination of defendant Barnes' guilt.

**Am Jur 2d, Homicide § 346.**

**Admissibility of statements of coconspirators made after termination of conspiracy and outside accused's presence. 4 ALR3d 671.**

11. **Criminal Law § 331 (NCI4th Rev.)— multiple defendants—murder, robbery, burglary—joinder—no abuse of discretion**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery as to defendant Barnes by joining his case with that of the other defendants. There is a strong policy in North Carolina favoring the consolidation of the cases of multiple defendants at trial when they may be held accountable for the same criminal conduct and severance is not appropriate merely because the evidence against one codefendant differs from the evidence against another. The differences in evidence must result in a conflict in the defendants' respective positions at trial of such a nature that, in viewing the totality of the evidence in the case, the defendants were denied a fair trial; however, substantial evidence of guilt may override any harm resulting from the contradictory evidence offered by them individually. The common sense of the jury, aided by appropriate instructions, is often relied on not to convict one defendant on the basis of evidence which relates only to the other. The trial court here offered limiting instructions when the statements were introduced and defendant Barnes failed to show an abuse of discretion.

**Am Jur 2d, Trial §§ 157, 158.**

12. **Criminal Law § 346 (NCI4th Rev.)— multiple defendants—joinder—evidence of guilt of other defendants**

Defendant Barnes was not entitled to severance in a prosecution for capital murder, burglary, and robbery although he contended that the differences in evidence against him when compared with evidence against his codefendants prevent a fair determination of his guilt. Much of the evidence which Barnes contends overwhelmed jurors would have been admissible against him in a separate trial. Moreover, the common sense of the jury, aided by appropriate instructions, is relied on not to convict one defendant on the basis of evidence which relates only to the other.

**Am Jur 2d, Trial § 165.**

13. **Criminal Law § 348 (NCI4th Rev.)— multiple defendants—severance denied—no error**

The trial court did not abuse its discretion by denying defendant Chambers' motion for severance in a capital prosecution for

first-degree murder, burglary, and robbery given the strong policy favoring the consolidated trials of defendants accused of collective criminal behavior, the limited evidence at issue here, the North Carolina Supreme Court's trust in the common sense of the jury, and the limiting instructions of the trial court.

**Am Jur 2d, Trial § 157.**

**14. Criminal Law § 348 (NCI4th Rev.)— multiple defendants— admission of redacted statement—motion for severance by defendant making statement**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery by denying defendant Blakney's motion for severance where Blakney contended that the introduction of his statements in a sanitized or redacted form denied him a fair trial in that his statements in their original form would have demonstrated that he was merely a passive participant in the crimes. The evidence at trial was sufficient for a finding of guilt based on acting in concert; any passivity by Blakney was a consideration more appropriate for sentencing. The redaction here does not rise to the level of exclusion of the statements in *State v. Boykin*, 307 N.C. 87 or *State v. Alford*, 289 N.C. 372.

**Am Jur 2d, Trial §§ 164, 165.**

**15. Criminal Law § 325 (NCI4th Rev.)— capital sentencing— motions to sever—denial not error**

There was no error in a capital prosecution for first-degree murder, burglary, and robbery in the trial court's denial of motions by defendants Barnes and Chambers to sever the capital sentencing proceeding where Barnes and Chambers argued that codefendant Blakney's testimony at sentencing was prejudicial to them. Blakney testified that he did not shoot the victims, that Barnes and Chambers shot the victims while he was in another room, and that he had not planned to kill anyone during the robbery; Barnes and Chambers did not testify and did not put forth any evidence challenging the testimony of their codefendant. The differences in evidence in this capital sentencing proceeding did not result in such antagonistic defenses as to deny a fair capital sentencing proceeding; each defendant could show why he should not receive the death penalty without arguing that the others should.

**Am Jur 2d, Trial § 173.**

Antagonistic defenses as ground for separate trials of codefendants in criminal case. 82 ALR3d 245.

16. **Criminal Law § 482 (NCI4th Rev.)— capital murder— juror's contact with brother concerning defendant— inquiry by court**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, burglary, and robbery where a juror volunteered during the State's presentation of evidence that it had been brought to his attention by his brother that the brother had known two of the defendants in prison, the trial court asked whether the juror and his brother had discussed the case, the juror responded that they had not, and the trial court made no further inquiry. The trial court was in a position to observe and scrutinize the juror's credibility with respect to the juror's response to the question and was satisfied that the juror had not been tainted; it cannot be said that the trial court's actions were so arbitrary that they could not have been the result of a reasoned decision.

**Am Jur 2d, Trial §§ 1562, 1564.**

17. **Criminal Law § 483 (NCI4th Rev.)— capital murder—juror misconduct—no abuse of discretion**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder, robbery, and burglary in disposing of issues concerning juror misconduct. Assuming *arguendo* that defense counsel's unsubstantiated assertion that a juror read Bible verses before deliberations began was accurate, there was no assertion that the juror's reading from the Bible was accomplished in the context of any discussion about the case itself or that it involved extraneous influences as defined by the North Carolina Supreme Court. As to whether there was an abuse of discretion in the court's failure to inquire further into the assertion that a juror read the Bible aloud in the jury room prior to the commencement of deliberations and prior to the trial court's instructions to the jury, there is no evidence that the alleged Bible reading was in any way directed to the facts or governing law at issue in the case. As to the juror's alleged actions in calling a minister to ask a question about the death penalty, nothing in this assertion involved "extraneous information" as contemplated in N.C.G.S. § 8C-1, Rule 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any

such discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case. It cannot be said under the particular circumstances of this case that the trial court's actions in failing to probe further into the sanctity of the jury room was an abuse of discretion.

**Am Jur 2d, Trial §§ 1562, 1610.**

**Propriety and effect of jurors' discussion of evidence among themselves before final submission of criminal case. 21 ALR4th 444.**

**18. Homicide § 583 (NCI4th)— capital murder—instructions— acting in concert—*Blankenship* overruled**

The trial court did not err in a capital prosecution for first-degree murder in its instruction to the jury on the doctrine of acting in concert with regard to premeditated and deliberate first-degree murder. Although the defendants argued that this instruction violated *State v. Blankenship*, 337 N.C. 543, by permitting the jury to find defendants guilty of premeditated and deliberate first-degree murder without specific findings that they individually possessed the requisite *mens rea* to commit that crime, *Blankenship, State v. Reese*, 319 N.C. 110, and their progeny are overruled to the extent that they are inconsistent with this opinion. The correct statement of the doctrine of acting in concert in this jurisdiction is that enumerated in *State v. Westbrook*, 279 N.C. 18, and *State v. Erlewine*, 328 N.C. 626.

**Am Jur 2d, Criminal Law § 180; Homicide § 263.**

**Propriety and effect of jurors' discussion of evidence among themselves before final submission of criminal case. 21 ALR4th 444.**

**19. Constitutional Law § 166 (NCI4th)— capital murder— instructions—acting in concert—*Blankenship* overruled— not *ex post facto* in this case**

The return to the acting in concert instructions as enumerated in *State v. Erlewine*, 328 N.C. 626, rather than *State v. Blankenship*, 337 N.C. 543, did not act as an *ex post facto* law in this capital first-degree murder prosecution because the crimes here were committed on 29 October 1992, defendants were sentenced on 10 March 1994, and the certification date for

*Blankenship* was 29 September 1994. The law on acting in concert at all relevant times during the disposition of this case was the rule as stated in *Erlewine,* which is reaffirmed.

**Am Jur 2d, Criminal Law § 144.**

**20. Criminal Law § 690 (NCI4th Rev.)— capital murder— peremptory instructions—nonstatutory mitigating circumstances—no error**

The trial court did not err as to defendants Barnes and Chambers in a capital sentencing proceeding in its peremptory instructions on nonstatutory mitigating circumstances. The peremptory instructions given were legally correct as they reflected the distinction between the statutory and nonstatutory mitigators, advised the jury that all of the evidence in the case tended to support the nonstatutory mitigating circumstance, and allowed but did not require the jury to find the circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599, 628.**

**21. Criminal Law § 1370 (NCI4th Rev.)— capital sentencing— especially heinous, atrocious, or cruel aggravating circumstance—vicarious actions**

There was no plain error in a capital sentencing proceeding as to defendants Barnes and Chambers where defendants contended that the instruction on the especially heinous, atrocious or cruel aggravating circumstance given by the court permitted the jury to find the circumstance vicariously based on the actions and specific intent of another defendant. The instruction was based on N.C.P.I. Crim. 150.10 and was said to be correct in *State v. Syriani,* 333 N.C. 350. Furthermore, the jury's findings tend to show that, for capital sentencing purposes, the jury adhered to the trial court's instruction to consider each defendant's involvement and culpability distinctly and that the jury did not find facts vicariously against one defendant based on the actions or intent of another.

**Am Jur 2d, Criminal Law § 628; Trial § 166.**

**22. Appeal and Error § 150 (NCI4th)— capital murder—constitutional error—not raised at trial—not preserved for appeal**

Defendants Barnes and Blakney were not heard on appeal from a capital sentencing hearing where they contended that the

trial court committed reversible constitutional error in overruling Barnes' objections to closing arguments made by the State but made no constitutional claims at trial.

**Am Jur 2d, Appellate Review § 614.**

**23. Criminal Law § 475 (NCI4th Rev.)— capital sentencing— prosecutor's argument—prosecutor lying on floor**

There was no error in a capital sentencing proceeding as to defendant Barnes where the prosecutor lay on the floor to demonstrate a previous attempted armed robbery by Barnes of a sixteen-year-old girl. Nothing in the record suggests that the prosecutor did anything other than lie on the floor and describe the attack; defendant has failed to show why or how this was an improperly prejudicial, theatrical, inflammatory demonstration.

**Am Jur 2d, Trial § 649.**

**24. Criminal Law § 1346 (NCI4th Rev.)— capital sentencing— prosecutor's argument—aggravating circumstances—not double counting**

There was no error in a capital sentencing proceeding as to defendant Barnes and Blakney where the prosecutor encouraged the jury to consider Mr. Tutterow's psychological torture in observing Mrs. Tutterow's death in determining the existence of the especially heinous, atrocious, or cruel aggravating circumstance and later encouraged the jury to use the death of Mrs. Tutterow to find the existence of the course of conduct aggravating circumstance. Aggravating circumstances are not redundant unless there is a complete overlap of evidence supporting them; some overlap in the evidence is permissible. Defendants concede that the court correctly instructed the jury not to find two or more aggravating circumstances from the same evidence and the argument did not conflict with any of the trial court's instructions and did not encourage the jury to ignore the instruction about not using the same evidence.

**Am Jur 2d, Criminal Law § 628; Trial § 572.**

**25. Criminal Law § 1349 (NCI4th Rev.)— capital sentencing— prosecutor's argument—mitigating circumstances—statutory and nonstatutory—value—no prejudicial error**

There was no prejudicial error as to defendants Barnes and Blakney in a capital prosecution where they contended that the

prosecution's argument on mitigating circumstances erroneously informed jurors that it was up to them to decide whether every mitigating circumstance, both statutory and nonstatutory, carried mitigating value, but immediately after the defense objection the prosecutor went on to differentiate between statutory and non-statutory mitigators.

**Am Jur 2d, Trial § 572.**

## 26. Evidence and Witnesses § 221 (NCI4th)— murder—subsequent possession of victim's property—relevance

The trial court did not err as to defendant Barnes in a capital prosecution for first-degree murder, robbery, and burglary by not limiting its instruction on the doctrine of possession of recently stolen property to burglary and robbery charges. Although Barnes argues that the instructions allowed the jury to infer premeditation and deliberation from the fact that he had stolen goods in his possession shortly after the time of the murders, the instruction informed the jurors that they were permitted, but not required, under the doctrine of recent possession to make the inference that Barnes stole the property in their determination of whether Barnes committed the other crimes at issue, but were allowed to use any such inference only to the extent appropriate under the other instructions of the trial court. The trial court's instructions in no way imply that the inference that a defendant stole property can be substituted for the jury's specific and independent findings as to whether Barnes premeditated and deliberated the killings.

**Am Jur 2d, Evidence § 541.**

## 27. Homicide § 242 (NCI4th)— first-degree murder—premeditation and deliberation—evidence sufficient

There was sufficient evidence of premeditation and deliberation as to defendant Barnes in a prosecution for first-degree murder, robbery, and burglary where the gunshot residue evidence tended to show that Barnes shot the victims, the fact that Barnes disposed of one of the murder weapons permits a reasonable inference that he had fired the weapon, and the State's evidence also tended to show that Barnes demonstrated a willingness to kill someone at different times on the day of the murders.

**Am Jur 2d, Homicide § 439.**

Modern status of the rules requiring malice "afore-thought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.

28. **Evidence and Witnesses §§ 1274, 1275 (NCI4th)— confession—waiver of rights—defendant's retardation and alcohol abuse**

The trial court did not err as to defendant Blakney in a capital prosecution for first-degree murder, robbery, and burglary in its determination that Blakney had knowingly and intelligently waived his *Miranda* rights where a psychologist testified that he believed that Blakney's mental retardation, in addition to difficulties related to Blakney's consumption of alcohol, rendered him unable fully to understand his *Miranda* rights. While intoxication and subnormal mentality are factors to be considered, they do not of themselves necessarily cause a confession to be inadmissible because of involuntariness or the ineffectiveness of a waiver; the factors as presented by Blakney here are not sufficient to render his confession inadmissible.

Am Jur 2d, Criminal Law § 797; Evidence § 744.

Mental subnormality of accused as affecting voluntariness or admissibility of confession. 8 ALR4th 16.

Sufficiency of showing that voluntariness of confession or admission was affected by alcohol or other drugs. 25 ALR4th 419.

29. **Evidence and Witnesses § 1708 (NCI4th)— first-degree murder—photographs of crime scene showing victims' wounds**

The trial court did not abuse its discretion as to defendant Blakney in a capital prosecution for first-degree murder, burglary, and robbery by allowing into evidence eighteen photographs that depicted the crime scene. All of the photographs illustrated testimony about the nature, number, and location of the victims' wounds and the court specifically noted for the record that it had examined the photographic evidence and determined that the probative value of all the photographs was not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. Moreover, two of the eighteen exhibits were excluded from publication to the jury as duplicative and the trial court prohibited the State from introducing two other photographs for presentation to the witness or for admis-

sion into evidence. Defendant failed to establish that the trial court abused its discretion.

**Am Jur 2d, Evidence §§ 961-964.**

**30. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing— prior felony involving violence—breaking or entering— testimony**

The trial court did not err during a capital sentencing proceeding as to defendant Frank Chambers by allowing testimony concerning a prior breaking and entering in support of the aggravating circumstance of a prior conviction for a felony involving the use or threat of violence where the witness testified that he had been bound, robbed, and severely beaten by an intruder he knew as "Richard Chambers"; the witness was unable to identify defendant in court; and the State introduced certified copies of the indictment, transcript of plea, and judgment in which Chambers pled guilty to breaking and entering the witness's residence. A proper in-court identification was unnecessary because the State introduced into evidence certified copies of the transcript of plea and judgment. The witness's testimony, along with the testimony by the investigating officer and photographs of the witness's injuries, support the conclusion that violence against the witness was an integral part of the commission of the breaking and entering. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law § 599.**

**31. Evidence and Witnesses § 213 (NCI4th)— first-degree murder—defendant's release from jail hours before murder—relevant to premeditation and deliberation and motive**

The trial court did not err as to defendant Chambers in a capital prosecution for first-degree murder, burglary, and robbery by admitting testimony regarding his release from jail a few hours before the murders. The evidence was relevant to premeditation and deliberation and to motive in that it tended to show that defendant knew Mr. Tutterow, who cooked part-time at the jail and served as a deputy sheriff and was known to carry significant amounts of money in his wallet, and in that it tended to show that defendant wanted money when he was released from jail without money.

**Am Jur 2d, Evidence § 525.**

STATE v. BARNES

[345 N.C. 184 (1997)]

**32. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

Death sentences for first-degree murders were not disproportionate where the record supports the jury's findings of aggravating circumstances, the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary consideration, and the sentences were not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the individual defendants. It is significant that a conviction was based upon both the theories of premeditation and deliberation; three of the four aggravating circumstances found in this case are most often found in death cases upheld on appeal; the presence of any of those three aggravators is sufficient when only a single aggravator is submitted and found; there has not been a finding of disproportionality when the previous violent felony conviction is found; the murder of multiple victims weighs heavily against defendant; and disproportionality has never been found in a case involving multiple murders. Defendant Barnes and Chambers robbed and viciously murdered two elderly victims and, in the course of the murders and the events that followed, showed an utter disregard for the value of human life. Although a number of mitigating circumstances were found as to Barnes, it cannot be said that the death sentences are disproportionate.

**Am Jur 2d, Criminal Law § 628.**

Justice FRYE dissenting.

Justices WHICHARD and PARKER join in this dissenting opinion.

Appeal as of right by defendants pursuant to N.C.G.S. § 7A-27 from judgments imposing sentences of death with respect to defendants Barnes and Chambers and sentences of life imprisonment with respect to defendant Blakney entered by Helms, J., on 10 March 1994, in Superior Court, Rowan County, upon jury verdicts finding defendants guilty of first-degree murder. Defendant Chambers' motion to bypass the Court of Appeals as to his robbery and burglary convictions was allowed by this Court on 6 June 1995; defendants Barnes' and Blakney's motions to bypass the Court of Appeals as to their robbery and burglary convictions were allowed on 14 June 1995. Heard in the Supreme Court 17 May 1996.

**STATE v. BARNES**

[345 N.C. 184 (1997)]

*Michael F. Easley, Attorney General, by William B. Crumpler and John G. Barnwell, Assistant Attorneys General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant Barnes.*

*Fred W. DeVore, III, for defendant-appellant Blakney.*

*Seth R. Cohen and J. David James for defendant-appellant Chambers.*

MITCHELL, Chief Justice.

Defendants William Leroy Barnes, Robert Lewis Blakney, and Frank Junior Chambers were tried jointly and capitally upon indictments charging them each with two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of first-degree burglary in connection with the killings of B.P. and Ruby Tutterow. The jury returned verdicts finding all three defendants guilty of both counts of first-degree murder on the theory of premeditation and deliberation as well as under the felony murder rule. The felonies the jury relied upon in finding defendants guilty of felony murder were burglary and both counts of armed robbery. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendants Barnes and Chambers be sentenced to death for each murder and that defendant Blakney be sentenced to a mandatory term of life imprisonment for each murder. The trial court accordingly sentenced defendants Barnes and Chambers to death for the first-degree murders and sentenced defendant Blakney to two terms of life imprisonment. Defendants were also each sentenced to two terms of forty years' imprisonment for armed robbery and a term of forty years' imprisonment for burglary. All sentences are to be served consecutively.

Defendants appeal to this Court as a matter of right from the judgments and respective sentences of death and life imprisonment for the first-degree murders. We allowed their motions to bypass the Court of Appeals on their appeal of the judgments entered for the offenses of armed robbery and burglary. For the reasons set forth in this opinion, we conclude that defendants received a fair trial, free from prejudicial error, and that the respective death and life sentences imposed by the trial court must stand.

While we discuss the relevant evidence in detail where necessary in the individual assignments of error, a brief synopsis of the evidence introduced at trial is as follows: On 29 October 1992, all three defendants went to the Salisbury home of B.P. and Ruby Tutterow to rob the Tutterows. Defendant Chambers had met B.P. while incarcerated at the Rowan County jail, where B.P. cooked part-time and served as a deputy sheriff. B.P. was known to carry significant amounts of money in his wallet and had given defendant Chambers money to buy cigarettes and food while Chambers was in jail.

Chambers was released from jail on the afternoon of 29 October, and shortly thereafter met up with defendant Blakney and Antonio Mason at a nearby convenience store. Chambers told Blakney and Mason that he had been released from jail without any money and that he knew someone who lived nearby who had plenty of money. Chambers said that he was willing to kill someone if it was necessary to get some money. After being unable to convince Mason to cooperate in their efforts, Chambers and Blakney joined up with defendant Barnes, who was at that time in the convenience store parking lot. Chambers, Blakney, and Barnes then went with others to the apartment of Cynthia Gwen, where the three defendants talked together about "mak[ing] a lick," or robbing someone. Barnes got into an argument with another man while at Gwen's apartment, and Gwen asked him to leave. The three defendants then left Gwen's apartment together around 10:00 p.m.

Patricia Miller was speaking with B.P. Tutterow on the phone around 10:00 p.m. that evening when she heard a commotion on the line and the phone went dead. After attempting to reach the Tutterows several times, Miller telephoned the police around 11:30 p.m. Salisbury police officers arrived at the Tutterow home around 12:30 a.m. on 30 October and found the Tutterows dead and the house ransacked.

The Tutterows' daughters determined that several things were missing from their parents' home including B.P.'s .357 Magnum pistol and a .38-caliber revolver, B.P.'s gold wedding band and gold watch, several items of jewelry, two bank bags that usually contained cash, and a bag of antique coins including some Susan B. Anthony dollars and Kennedy half-dollars.

Physical evidence in the home tied defendants Blakney and Chambers to the crime. The DNA profile of a sample drawn from one cigarette butt found in the house matched that of Chambers, and the

profile on another butt matched that of Blakney. A latent fingerprint on a money box found in one bedroom matched Chambers' left middle finger. A print obtained from another money box matched that of Blakney's left palm.

Around 11:00 p.m. on the night of the murders, Barnes, Blakney, and Chambers went to the apartment where Antonio, Sharon, and Valerie Mason lived. Blakney and Chambers told Sharon that they would pay her for the use of her car to go to Kannapolis to dispose of some guns. Although Sharon refused, Blakney gave the two women around twenty to forty dollars and gave Valerie a wedding band with one small diamond. When Valerie asked Blakney where he got the ring, he replied that "we f----- up a police" and that it was a "three-person secret." Blakney further told Valerie that he, Barnes, and Chambers had some jewelry and guns. Barnes and Chambers each then showed Valerie and Sharon a gun.

Defendants then left with Antonio to buy drugs. They bought about sixty dollars worth of crack at a nearby apartment complex and returned to the Mason apartment to smoke it, after which defendants left the apartment again. Shortly thereafter, Antonio, Sharon, and Valerie heard sirens and followed the sounds to the Tutterow home, where they learned of the murders. Valerie told an officer at the scene that "[Blakney] shouldn't have killed those people like that" and went to the police department around midnight to tell the police what she knew.

Some time after midnight, Everette Feamster, a Salisbury cab driver, drove defendants to the Bradshaw Apartments in Salisbury. Feamster and a passenger in the cab, Charles Fair, testified that they heard defendants talking about money and saw them passing money back and forth. Upon arriving at the Bradshaw Apartments, Barnes purchased three hundred dollars' worth of crack cocaine from Wayne Smith and bought more crack from Willie Peck. Barnes later sold B.P.'s .38-caliber revolver for five rocks of crack. Defendants then went to several other parties throughout the early morning, during which time they bought as much as one thousand dollars' worth of crack from Smith and varying amounts of crack from other sellers. At the home of Paula Jones, Smith saw Barnes with a pistol stuck in his pants and Blakney with a pistol in his pants. Blakney then gave his pistol to Chambers.

During the early morning of 30 October 1992, Blakney pawned two rings—a "mother's ring" with three birthstones and a wedding

band—and some antique coins. Barnes attempted to sell a gold watch with diamonds on the face to Joseph Knox. Chambers attempted to hide Mr. Tutterow's .357 Magnum pistol at the home of Carl Fleming. Barnes was taken into custody on the morning of 30 October, Blakney was arrested that afternoon, and Chambers turned himself in that afternoon.

All three defendants later made statements to police, but each denied having been involved in the killings of the Tutterows. Chambers admitted to having been in the Tutterow home and told Rachel Eberhart, "Hell yeah, I killed the m---- f-----," although he later said he was merely kidding. Blakney told police that he took items from the bedrooms but that he did not take part in the shootings. Barnes denied having seen Blakney or Chambers on 29 October 1992 and stated that he had nothing to do with the killings. Special Agent Michael Creasy testified that the palms of Barnes' hands had indications of gunshot residue on them and explained that the concentrations on Barnes' palms could have been a result of Barnes having merely handled a gun rather than having actually shot one. Gunshot residue was also found on the waistbands of Barnes' and Chambers' pants. Furthermore, during court proceedings in November, Barnes wore a gold necklace and a watch belonging to the Tutterows.

Dr. Brent Hall testified that Ruby Tutterow died as a result of multiple gunshot wounds. She suffered ten wounds in all, four of which were to the head. Hall testified that two of these wounds, one to the head and one to the back, had the potential to be rapidly fatal. Dr. Deborah Radisch testified that B.P. Tutterow also suffered multiple gunshot wounds and died as a result of a gunshot to the chest in combination with several shots to the face and head. B.P. had also been beaten and had suffered a number of defensive wounds. Special Agent Thomas Trochum testified that the Tutterows were shot with both a .357 Magnum revolver and .38-caliber revolver, although he added that he could not say whether a third gun was involved.

## ARGUMENTS OF BARNES, BLAKNEY, AND CHAMBERS

We first deal with the several issues to which defendants jointly assign error. In assignments of error, defendants contend that the trial court committed an abuse of discretion by denying defendants' motion for change of venue, for individual *voir dire* of prospective jurors, and for additional peremptory challenges.

[1] With respect to the change of venue issue, defendants contend that widespread pretrial publicity "so infected the local community

that [they] could not receive a fair trial in Rowan County." Evidence presented at hearings on the change of venue motion tended to show that a number of articles were published and a number of television pieces aired in the Rowan County area about the circumstances of the murders. This coverage dealt with a number of different issues involving the murders: the resignation of an assistant district attorney because of the premature release of Chambers from jail hours before the killings; threats made against defendants and the relocation of defendants outside Rowan County because of these threats; the withdrawal of defense counsel because of the attorneys' inability to provide an effective defense because of conflicts, resulting in the trial court having to go outside Rowan County to find representation for defendants; and numerous descriptions of the good character of the victims. Defendants offered a survey taken over one year after the murders indicating that between seventy-eight and ninety-six percent of the Rowan County population knew about the murders. About one-third of the population believed that defendants were guilty and forty percent of the individuals surveyed who knew something about the murders had received at least some of their information through local word-of-mouth communication. Defendants further point out that of the 153 potential jurors, 136 had heard about the murders, 36 had formed an opinion as to the guilt of defendants, and 31 were excused for cause for being unable to set aside these opinions. At least nine of the twelve jurors who actually decided the case knew of the murders prior to their selection as jurors. Judge Walker, and later Judge Helms, denied defendants' motions to change venue.

It is axiomatic that criminal defendants have the right to be tried by an impartial jury free from outside influences. *State v. Boykin*, 291 N.C. 264, 269, 229 S.E.2d 914, 917 (1976). Motions for change of venue are governed by N.C.G.S. § 15A-957, which provides in pertinent part:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60 . . . .

N.C.G.S. § 15A-957(1) (1988). We explained the test for determining when a change of venue is warranted in *State v. Yelverton*, 334 N.C. 532, 434 S.E.2d 183 (1993):

> The test for determining whether venue should be changed is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." [*State v. Jerrett*, 309 N.C. 239,] 255, 307 S.E.2d [339,] 347 [(1983)]. The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant. "In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." [*Id.*] at 255, 307 S.E.2d at 348. The determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law.

*Yelverton*, 334 N.C. at 539-40, 434 S.E.2d at 187 (citations omitted). A defendant must be afforded the opportunity to ensure the impartiality of the jury through means such as *voir dire. State v. Jaynes*, 342 N.C. 249, 464 S.E.2d 448 (1995), *cert. denied*, —— U.S. ——, 135 L. Ed. 2d 1080 (1996).

We have stated in many cases that defendants must ordinarily establish specific and identifiable prejudice against them as a result of pretrial publicity. *See, e.g., State v. Lane*, 334 N.C. 148, 151-52, 431 S.E.2d 7, 9 (1993). In *Jerrett*, we held that for a defendant to meet his burden of showing that pretrial publicity prevented him from receiving a fair trial, he must show *inter alia* that jurors with prior knowledge decided the case, that he exhausted his peremptory challenges,

and that a juror objectionable to him sat on the jury. *Jerrett,* 309 N.C. at 255, 307 S.E.2d at 347-48. While at least nine sitting jurors in the present case had been exposed to pretrial publicity and defendants did exhaust all of their peremptory challenges, no defendant has specifically identified a single juror who was objectionable to him. In *State v. Alston,* 341 N.C. 198, 225-26, 461 S.E.2d 687, 701 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 100 (1996), we held that where "the record reveals no basis upon which to conclude that any juror based his or her decision upon pretrial information rather than the evidence presented at trial," defendant cannot carry his burden of showing specific and identifiable prejudice. As the jurors at issue in this case each stated unequivocally that they would be able to arrive at a determination of defendant's guilt or innocence based solely upon the evidence presented at trial and defendants have not offered particular objections to any individual juror, defendants have not shown any specific and identifiable prejudice necessitating a change of venue.

[2] Our examination of this issue does not conclude with this finding. We also indicated in *Jerrett* that where the totality of the circumstances reveals that a county's population is "infected" with prejudice against a defendant, we will find that the defendant fulfilled his burden of showing that he would not receive a fair trial in that county. *Jerrett,* 309 N.C. at 258, 307 S.E.2d at 349. We based this on the Supreme Court's decision in *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600 (1966). *Sheppard* involved a "trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival." *Murphy v. Florida,* 421 U.S. 794, 799, 44 L. Ed. 2d 589, 594 (1975). The Supreme Court stated in *Sheppard* that, while a defendant must ordinarily show specific prejudice, " 'at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.' " *Sheppard,* 384 U.S. at 352, 16 L. Ed. 2d at 614 (quoting *Estes v. Texas,* 381 U.S. 532, 542-43, 14 L. Ed. 2d 543, 550 (1965)).

In *Jerrett,* this Court noted that: (1) "the crime occurred in a small, rural and closely-knit county where the entire county was, in effect, a neighborhood," *Jerrett,* 309 N.C. at 256, 307 S.E.2d at 348, with a population at that time of 9,587 people, *id.* at 252 n.1, 307 S.E.2d at 346 n.1 (citing U.S. Census Report); (2) the *voir dire* showed that around one-third of the prospective jurors knew the victim or some member of the victim's family, many jurors knew potential State's witnesses, four jurors who decided the case knew

the victim's family or other relatives, six jurors who decided the case knew State's witnesses, and the foreman stated that he heard a relative of the victim discussing the case in an emotional manner, *id.* at 257, 307 S.E.2d at 348-49; and (3) the jury was examined collectively on *voir dire* rather than individually, thereby allowing potential jurors to hear that other potential jurors knew the victim and the victim's family, that some had already formed opinions in the case, and that some would be unable to give the defendant a fair trial, *id.* at 257-58, 307 S.E.2d at 349. A majority of this Court concluded that, based on the totality of the circumstances, there was a reasonable likelihood that the defendant would not be able to receive a fair trial before a local jury. *Id.*

Several factors distinguish the case *sub judice* from both *Sheppard* and *Jerrett*. With a population exceeding 110,000, *North Carolina Manual 1993-1994*, at 1083 (Lisa A. Marcus ed.), Rowan County does not constitute the small "neighborhood" type of environment at issue in *Jerrett*. While a number of prospective jurors had heard about the case prior to trial, none of the seated jurors possessed any preconceived notions about the guilt or innocence of the defendants. Furthermore, the level of familiarity that the *Jerrett* jurors had with the victim, the victim's family, and the State's witnesses is not present in this case. While the influence of the news media in cases like *Sheppard*, *Estes v. Texas*, 381 U.S. 532, 14 L. Ed. 2d 543 (1965), and *Rideau v. Louisiana*, 373 U.S. 723, 10 L. Ed. 2d 663 (1963), "pervaded the proceedings," whether in the community at large or in the courtroom, and resulted in a "circus atmosphere" *in the courtroom itself during trial, see Murphy*, 421 U.S. at 799, 44 L. Ed. 2d at 594 (discussing *Estes*), the record in this case does not show that the legal proceedings at issue here were merely a sideshow to the larger carnival of public spectacle. Rather, the trial court administered the proceedings in an able and commendable fashion, with the solemnity and gravity befitting a proceeding in which the fate of three defendants would be determined.

Moreover, the Supreme Court warned in *Murphy* that those cases mentioned above "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy*, 421 U.S. at 799, 44 L. Ed. 2d at 594. We have consistently held that factual news accounts with respect to the commission of a crime and the pretrial proceedings relating to that crime do not of themselves warrant

a change in venue. *See, e.g., State v. Soyars*, 332 N.C. 47, 53, 418 S.E.2d 480, 484 (1992). While at least nine of the seated jurors in this case had been exposed to some information about the killings before trial, there is no indication that these factual accounts were prejudicial to defendants. The jurors' responses themselves show that none of the seated jurors found the pretrial publicity sufficiently damning to provoke any preconceived notions about defendants' guilt or innocence. We therefore conclude that, in viewing the totality of the circumstances in this case, there is not a reasonable likelihood that pretrial publicity prevented defendants from receiving a fair trial in Rowan County and that the trial court did not err in refusing to grant defendants' motions for change of venue.

[3] Defendants further argue that this Court has virtually foreclosed appeals with respect to change of venue issues, noting that we held in *State v. Moore*, 335 N.C. 567, 586, 440 S.E.2d 797, 808, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174 (1994), that a trial court does not err in refusing to allow a change of venue when "each juror states unequivocally that he can set aside what he has heard previously about a defendant's guilt and arrive at a determination based solely on the evidence presented at trial." Defendants contend that this statement of the law with respect to change of venue motions violates *Murphy*, in which the Supreme Court held that "the juror's assurances that he is equal to [the task of setting aside his preconceived notions about a case] cannot be dispositive of the accused's rights." *Murphy*, 421 U.S. at 800, 44 L. Ed. 2d at 595. We disagree.

Our appellate courts have the power to consider the evidence and the totality of the circumstances in determining whether the trial court has erred in resolving such a motion. We continue to believe, however, that the most persuasive evidence as to whether pretrial publicity was prejudicial or inflammatory usually will be the potential jurors' responses to questions asked them during jury selection. *State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). We presume that jurors will tell the truth; our court system simply could not function without the ability to rely on such presumptions. Absent some reason to doubt jurors' unequivocal statements that they will rely solely on the evidence presented in determining the outcome of the trial, we have no need to further examine the validity of the trial court's ruling. These arguments are without merit.

[4] Defendants next challenge the trial court's refusal to allow individual *voir dire* of prospective jurors, arguing that the collective *voir*

*dire* "guaranteed that the entire jury pool would be infected and tainted by the opinions of . . . [some] jurors" that the defendants were guilty. "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1988). A trial court's ruling on the issue of individual *voir dire* will not be disturbed, however, absent an abuse of discretion. *State v. Short,* 322 N.C. 783, 788, 370 S.E.2d 351, 354 (1988).

Assuming *arguendo* that the trial court's ruling in this case was error, we conclude that any error in this regard was harmless. In *State v. Lee,* 335 N.C. 244, 439 S.E.2d 547, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 162 (1994), we held that any error in the trial court's refusal to allow individual *voir dire* was harmless, as the defendant had not been precluded from examining each of the jurors to reveal any possible prejudice resulting from pretrial publicity. *Id.* at 267-68, 439 S.E.2d at 558-59. In this case, the trial judge told defense counsel at the beginning of the proceeding that, while his practice was to deal with jury selection a panel at a time, he would entertain arguments on individual *voir dire* and would be glad to keep an open mind on the issue. As in *Lee,* the record here shows that the trial judge's ruling "was a reasoned decision by which he attempted to conserve judicial resources without foreclosing the possibility of allowing individual *voir dire* if it became necessary to ensure a fair jury selection process." *Id.* at 267, 439 S.E.2d at 558. Defendants have failed to identify any possible particular harm to them resulting from their being required to question each of the jurors in the presence of the others.

[5] Defendants also argue within this assignment of error that the trial court erred in refusing to grant defendants additional peremptory challenges, thereby preventing defendants from receiving a fair and impartial trial. N.C.G.S. § 15A-1217(a) provides that an individual defendant is entitled to fourteen peremptory challenges and that the State is entitled to fourteen challenges for each defendant. While the trial court had no authority to grant any additional peremptory challenges, *see State v. Hunt,* 325 N.C. 187, 198, 381 S.E.2d 453, 460 (1989), it nonetheless allowed each defendant an additional peremptory challenge because one juror who had been accepted by all parties was dismissed because of a family emergency. Defendants therefore enjoyed the use of a total of forty-five peremptory challenges, more than the statutory provision allows. This assignment of error is without merit.

STATE v. BARNES

[345 N.C. 184 (1997)]

[6] In other assignments of error, defendants contend that the trial court erred in allowing the State to exercise peremptory challenges in a racially discriminatory manner. Defendants point to the dismissal of prospective jurors Melodie Hall, Lana Jones, and Judge Cherry and argue that the prosecution struck these prospective jurors because they are African-American.

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), the Supreme Court created the first tentative and halting outline of an equal protection framework for the resolution of issues surrounding racial discrimination in the exercise of peremptory challenges. We recently summarized the current status of the doctrine in *State v. Lyons*, 343 N.C. 1, 468 S.E.2d 204, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 167 (1996):

> In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges to exclude a juror solely on account of his or her race. *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83. The Supreme Court established a three-part test to determine if a prosecutor has impermissibly excluded a juror based on race. First, *the defendant must* establish a *prima facie* case of purposeful discrimination. If the defendant succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the prosecutor to offer a race-neutral explanation for each challenged strike. Finally, the trial court must determine whether the defendant has proven purposeful discrimination.
>
> . . . .
>
> In order to rebut a *prima facie* case of discrimination, the prosecution must articulate legitimate reasons which are clear, reasonable and related to the particular case to be tried. The prosecutor's explanation need not, however, rise to the level justifying a challenge for cause. Furthermore, if not racially motivated, the prosecutor may exercise peremptory challenges on the basis of legitimate hunches and past experience.
>
> . . . [In explaining the reasons for the exercise of a peremptory challenge, t]he prosecutor is not required to provide an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in

the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez [v. New York]*, 500 U.S. [352,] 360, 114 L. Ed. 2d [395,] 406 [(1991)].

*Lyons,* 343 N.C. at 11, 13, 468 S.E.2d at 208, 209 (citations omitted). In *State v. Rouse,* 339 N.C. 59, 451 S.E.2d 543 (1994), *cert. denied,* ——— U.S. ———, 133 L. Ed. 2d 60 (1995), we observed that

[w]here "a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," the issue is whether the reason given by the prosecutor was legitimate or merely pretextual. *Hernandez v. New York,* 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991); *State v. Robinson,* 330 N.C. 1, 16, 409 S.E.2d 288, 296 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation the reason offered will be deemed race neutral." *Hernandez,* 500 U.S. at 360, 114 L. Ed. 2d at 406. As this determination is essentially a question of fact, the trial court's decision of whether the prosecutor had a discriminatory intent will be upheld unless that finding is clearly erroneous.

*Rouse,* 339 N.C. at 78, 451 S.E.2d at 553 (citations omitted). We have also noted with respect to the exercise of our review in these matters that the investigation into a prosecutor's state of mind on the demeanor and credibility of a particular juror is a matter peculiarly within the province of the trial court. *State v. Robinson,* 336 N.C. 78, 94, 443 S.E.2d 306, 313 (1994), *cert. denied,* ——— U.S. ———, 130 L. Ed. 2d 650 (1995). It is with these principles in mind that we turn to the issues with respect to the prosecutor's exercise of peremptory challenges in this case.

The trial court ruled that defendants failed to make a *prima facie* showing of racial discrimination in the State's exercise of peremptory challenges against prospective jurors Hall, Jones, and Cherry. With respect to prospective juror Melodie Hall, the trial court ruled that defendants had not made a *prima facie* showing of discrimination in the prosecutor's dismissal of Hall, "but out of an abundance of caution" asked the district attorney to state his reasons for excusing Hall should the information be necessary at a later time. The district attorney explained that

she—in the first instance is the same age as these defendants, she is 32 years old according to what she stated, she is physically

attractive and she is single. In addition to that, which I would contend that Mr. Blakney at least, has been described by his psychiatrist as attractive . . . . She has expressed that in her associations that she stated that returning a guilty verdict of first degree murder and returning a death sentence that she would be subject to criticism from her acquaintances. When I asked her the first time about whether that would affect her ability to decide this case, there was a long period of hesitation before she said there was not. That is essentially the answer that [another juror] and other people that we have exercised peremptory challenges, have been hesitant or unclear in [thei]r answers, which would lead me to conclude that they were unclear if the answer they were giving was, in fact, correct. She, I think, was rehabilitated from that position by The Court, but when I asked her those questions, she was slow. My recollection is that she would not maintain eye contact with me during the time that I was asking those questions. I would say that her hairstyle and personal appearance would indicate potentially a nonconformist or non-traditional approach to her life. She . . . works in Charlotte, therefore, is not a local person and is subject to whatever conversation she would have at that time on her job. . . . I think I mentioned that she is single and mentioned that in terms of her age group and this group of defendants and would say that her being single indicates that she is less stable in her life-style and potentially less responsible. Those are all things that are at least factors. I would point out that the State's jury selection Voir Dire was racially neutral until that subject was approached by the defense in their examination of white jurors. We did not bring this issue into this trial until it was brought out by defense counsel in the course of that Voir Dire and we contend that those are all legitimate constitutional reasons for the exercise of peremptory challenges.

After the trial court and defense counsel discussed the prosecutor's reasons, the court found that the reasons were not pretextual.

Defendants attack the reasoning of the prosecutor and the overall method by which the jury was selected in two ways: (1) that a juror or jurors of a different race from those venire members who were peremptorily excused were asked similar questions by the prosecutor, gave answers similar to those of the prospective jurors peremptorily excused, and later sat on the jury that decided the case; and (2) that there was a variation in the number of questions asked or the manner of questioning in examining those venire members

peremptorily challenged and those who actually sat on the jury. We have noted with respect to this type of argument that even if answers of a venire member of one race who is later peremptorily excused are similar to those of a juror of another race who sits in judgment of a defendant and the manner of questioning the two differs, this state of circumstances in itself does not necessarily lead to a conclusion that the reasons given by the prosecutor were pretextual. *Rouse*, 339 N.C. at 80, 451 S.E.2d at 554. It also bears repeating that jury selection is "more art than science" and that only in the rare case "will a single factor control the decision-making process," *State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 152 (1990), as well as that a prosecutor may rely on legitimate hunches in the exercise of peremptory challenges, *Rouse*, 339 N.C. at 79, 451 S.E.2d at 554.

In examining the prosecutor's reasoning in light of the totality of the circumstances, we cannot say that the trial court's ruling was clearly erroneous. No discriminatory intent was inherent in the prosecutor's explanations of the peremptory challenge of Hall. The prosecutor's questioning techniques throughout the jury selection process for jurors black and white alike focused on age, marital status, and circumstances involving racial sensitivity or favoritism. The trial court's determination that the dismissal of Hall was not the product of discriminatory intent was not clearly erroneous and will be upheld.

Similarly, the trial court's conclusion that no *prima facie* case of discrimination existed with respect to the prosecution's peremptory challenge of Lana Jones was not clearly erroneous. Although finding that no *prima facie* case existed, however, the trial court did ask the prosecutor to offer an explanation for the challenge "so we'll have it"; the prosecutor responded that

> [Lana Jones] is 22 years old. She stated she went to school with a State's witness, Curtis Cowan, who we know to be a convicted felon. She said that she had no prior knowledge of this case at all and my recollection is that she may be the only one that has said they haven't heard anything about this. . . . [S]he . . . had only been working since August and that would indicate a lack of stability. I would also point out at the same exercise of peremptory challenges we excused a 20 year old white male at the same time we excused [Lana] Jones.

We note again that age was one of a number of important factors in the prosecutor's strategy for the jury selection process. With

STATE v. BARNES

[345 N.C. 184 (1997)]

respect to the other factors, Jones' familiarity with a witness who was a convicted felon and the absence of any work history are both legitimate race-neutral reasons for the prosecutor's exercise of the peremptory challenge. The trial court's ruling as to Jones was not clearly erroneous.

With respect to the prosecutor's peremptory challenge of Judge Cherry, the trial court also concluded that defendants had not made a *prima facie* showing of racial discrimination. The trial court, however, again asked the prosecutor to explain his strike to preserve the information for the record, and the prosecutor stated as follows:

> Mr. Cherry stated that he, for a period of about two years[,] had lived in the same area as the defendant, Robert Blakney, and had known two of his brothers and had seen his two brothers, I believe he said within the last couple of years. That he also knew a person listed on the list of witnesses, Mr. Leon Melton, and that he had played softball with him. He said that he was a member of a church that as a regular part of its procedure visited with inmates at the local prisons and it's on that basis the State excused him.

Each of the prosecutor's reasons are supported by the record and are facially race-neutral. As we cannot say that the trial court's rulings with respect to venire members Hall, Jones, and Cherry were clearly erroneous, we therefore conclude that these assignments of error are without merit.

[7] Defendants next contend by assignments of error that the trial court erred in allowing the use of mannequins at trial for the purpose of illustrating the number and the direction of bullet wounds incurred by the Tutterows. Defendants argue on appeal that the demonstration, during which Dr. Deborah Radisch used colored dowels and mannequins to illustrate her testimony about the angles at which the bullets entered the bodies, was both cumulative and unfairly prejudicial.

In *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986), we held that the decision to exclude evidence pursuant to Rule 403 of the North Carolina Rules of Evidence whether based on its cumulative nature or because the danger of unfair prejudice substantially outweighs its probative value is left to the sound discretion of the trial court. The evidence presented in this case with respect to the killings was complex. In addition to Dr. Radisch's testimony concern-

ing the paths of the bullets and the medical examination that accompanied her autopsy of the Tutterows, there was also testimony accompanying the physical evidence with respect to ballistics, fiber evidence, residue at the crime scene, and blood splatter evidence. When viewed in context, such evidence supported a reconstruction of events on the night of the killings, including where the shooters and victims were positioned, how many guns were used, and the order in which the various shots were fired. The three-dimensional evidence involving the mannequins and dowels that Dr. Radisch used to illustrate her testimony was undoubtedly helpful to the jury in resolving and understanding these complex issues. The evidence concerning the bullet paths was also probative with respect to premeditation and deliberation, as the nature and number of a victim's wounds and whether wounds are inflicted after a victim has been rendered helpless are circumstances to be considered in this determination. *State v. Sierra*, 335 N.C. 753, 759, 440 S.E.2d 791, 795 (1994). Defendants have not established an abuse of discretion by the trial court, and these assignments of error are therefore overruled.

Defendants contend in several assignments of error that the trial court erred by admitting into evidence a number of hearsay statements that prejudiced them and denied them their due process and confrontation rights. We deal first with the contentions of defendant Barnes.

**[8]** Barnes argues that the trial court's admission into evidence of hearsay statements by defendants Blakney and Chambers violated his federal and state constitutional rights. He points to two exchanges that he argues unfairly prejudiced him: (1) Valerie Mason's testimony that when she asked Blakney about where he had acquired a ring that he gave to her, Blakney said that "it was a three-person secret" and that "we f——— up a police"; and (2) Reverend Betty Smith's testimony that Chambers told her that "I shouldn't have gone with them." Barnes argues that the trial court should have redacted both of these statements to avoid prejudicing him.

In *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968), the Supreme Court held that defendant Bruton's confrontation rights were violated by the admission into evidence of a nontestifying codefendant's confession that implicated Bruton in the crime. *Id.* at 126, 20 L. Ed. 2d at 479-80. The admission of the confession was "powerfully incriminating," *id.* at 135, 20 L. Ed. 2d at 485, and the Supreme Court explained that

because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt, admission of [the codefendant's] confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.

*Id.* at 126, 20 L. Ed. 2d at 479. The Supreme Court also noted in *Bruton* that no recognized exception to the hearsay rule applied in that case. *Id.* at 128 n.3, 20 L. Ed. 2d at 480-81 n.3. Here, at least two firmly established exceptions apply.

We stated in *State v. Stager,* 329 N.C. 278, 317, 406 S.E.2d 876, 898 (1991), that statements falling within an exception to the hearsay rule may be admitted without violating a defendant's confrontation rights if the evidence is reliable. We also held in *State v. Fox,* 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968), that before a confession of a nontestifying codefendant is admitted into evidence in a consolidated trial, all portions of the confessions implicating another defendant must be deleted. *See also* N.C.G.S. § 15A-927(c)(1) (1988). We further noted in *State v. Littlejohn,* 340 N.C. 750, 755, 459 S.E.2d 629, 632 (1995), that the *Bruton* rule may be invoked when, although the implicated codefendant is not mentioned by name, it is clear that the statement refers to him.

With respect to Blakney's statements that "it was a three-person secret" and "we f----- up a police," these statements fall within the exception enumerated in Rule 804(b)(3), which provides that a declarant's statement, accompanied by clear corroborating circumstances, may be admitted when it "at the time of its making . . . so far tended to subject him to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." N.C.G.S. § 8C-1, Rule 804(b)(3) (1992). Blakney's conversation with Valerie Mason tended to subject him to criminal liability, and he no doubt knew the consequences of acknowledging his involvement in an attack on a law enforcement officer. His statements therefore fit within the hearsay exception in Rule 804(b)(3).

Barnes argues further that the Supreme Court's decision in *Williamson v. United States,* 512 U.S. 594, 129 L. Ed. 2d 476 (1994), mandates the conclusion that the statements were inadmissible under the federal analogue to our Rule 804(b)(3) insofar as they were non-self-inculpatory. In *Williamson,* the Supreme Court held

that under federal Rule 804(b)(3), statements of a codefendant declarant are admissible as long as they are self-inculpatory. *Id.* at ——, 129 L. Ed. 2d at 483-84. The Supreme Court explained that

Rule 804(b)(3) is founded on the common-sense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. . . .

. . . .

. . . "Due to [a codefendant's] strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence."

*Id.* at ——, ——, 129 L. Ed. 2d at 482, 483 (quoting *Lee v. Illinois*, 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526 (1986)). While we do not here rule on any issues concerning the scope of North Carolina's Rule 804(b)(3) hearsay exception for statements against penal interest, we conclude that the *Williamson* test is satisfied in this case and that Blakney's statements would not violate federal Rule 804(b)(3). Blakney's statements in this case were completely self-inculpatory, as the comment that "*we* f----- up a police" directly and obviously incriminated Blakney. Blakney's comments do not have the taint of "special suspicion" reserved for those statements aimed at implicating another defendant while exonerating the declarant and therefore do not violate the *Williamson* rule.

[9] Blakney's statements also fit within the exception for statements of a coconspirator found in Rule 801(d)(E), which provides that a statement may be admitted as a hearsay exception "if it is offered against a party and it is . . . a statement by a coconspirator of such party during the course and in furtherance of the conspiracy." N.C.G.S. § 8C-1, Rule 801(d)(E) (1992). A criminal conspiracy is an express or implied agreement between two or more persons to do an unlawful act, to do a lawful act in an unlawful way, or to do a lawful act by unlawful means. *State v. Gibbs*, 335 N.C. 1, 47, 436 S.E.2d 321, 347 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994). It is not necessary for the prosecution to establish the existence of the conspiracy before the admission of a hearsay statement falling within this exception as long as the existence of the conspiracy is eventually established. *State v. Polk*, 309 N.C. 559, 565-66, 308 S.E.2d 296, 299 (1983).

Evidence presented at trial tended to show that while at the convenience store with Antonio Mason, defendants planned to rob the Tutterows. They went to the Tutterow house and robbed and killed the victims. They then went to Valerie Mason's apartment, where they offered Sharon Mason money if she would let them take her car to get rid of some guns, and they gave away some of the Tutterows' belongings while at the Mason apartment. The jury could find from the evidence that defendants' conduct up to and including the robbery at the Tutterows was part of a conspiracy. The jury also could find that the subsequent actions of defendants were in the course of and in furtherance of the conspiracy, as Blakney's remarks and the actions of defendants were designed to conceal their involvement in the crimes. In *State v. Willis*, 332 N.C. 151, 420 S.E.2d 158 (1992), we reaffirmed that the statement of a coconspirator during the course of and in furtherance of the conspiracy is admissible and is not barred by *Bruton*. *Id.* at 167-68, 420 S.E.2d at 165. Blakney's statements were therefore admissible against Barnes, and this argument is without merit.

[10] With respect to the statement of Chambers that "I shouldn't have gone with them," Barnes argues that this statement was "particularly significant" and therefore prejudicial and that it also violated his due process and confrontation rights. In *Bruton*, the Supreme Court held that the introduction of a codefendant's hearsay statement "posed a substantial threat to petitioner's right to confront the witnesses against him" and therefore constituted reversible error. *Bruton*, 391 U.S. at 137, 20 L. Ed. 2d at 485. The Supreme Court noted that

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.

*Id.* at 135-36, 20 L. Ed. 2d at 485.

We find the situation in the case *sub judice* to be distinguishable from that in *Bruton*. The statement about which Barnes complains is not "powerfully incriminating," especially when viewed in the context of the evidence against him. Chambers' reference to "them" was not made in the context of any specific statements about the killings,

and the trial court cautioned the jury with respect to Chambers' statement. The Supreme Court observed in *Bruton* that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions . . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." *Id.* at 135, 20 L. Ed. 2d at 484-85. We conclude that Chambers' statements did not clearly identify Barnes or create a substantial risk that the jury would ignore the trial court's instructions in its determination of Barnes' guilt. Therefore, Barnes' arguments are without merit.

Defendant Blakney also argues that Reverend Smith's testimony that Chambers stated that "I shouldn't have gone with them" prejudiced him and violated his due process rights. For the reasons previously discussed, Blakney's assignments of error in this regard are also overruled.

Defendant Chambers contends that Valerie Mason's testimony with respect to Blakney's statements violated the *Bruton* rule. As discussed previously, these statements were admissible against Chambers, as they were against Barnes, as exceptions to the hearsay rule under Rules 804(b)(3) (statements against penal interest) and 804(d)(E) (statements of a coconspirator in the course of and in furtherance of the conspiracy). This argument is without merit.

We therefore conclude that these assignments of error by defendants are without merit.

In other assignments of error, defendants argue that the trial court committed reversible error by joining their cases for both trial and sentencing. We deal with these contentions in turn.

[11] Defendant Barnes contends that the trial court abused its discretion in joining his case with that of the other codefendants. He argues (1) that hearsay testimony concerning statements from the nontestifying codefendants unfairly prejudiced him, and (2) that the extreme disparity in the evidence against him as compared with that against the other codefendants mandated separate trials. At trial, Barnes objected to four statements: (1) the testimony of Valerie Mason that defendant Blakney told her on the night of the murders that "we f——— up a police"; (2) testimony that defendant Chambers told his minister that "I shouldn't have gone with them"; (3) testimony that Chambers stated that he "wasn't going back to jail without . . .

killing somebody"; and (4) that, upon being told about news reports of murders committed by another person, Chambers said, "everybody have [sic] to die sometime," and, "it wasn't your momma and daddy." Barnes argues that although the trial court gave a limiting instruction that these statements should not be considered as evidence against Barnes, the risk that they would unfairly prejudice him warranted severance.

The governing law with respect to issues involving severance provides:

> (b) Severance of Offenses.—The court, on motion of the prosecutor or on motion of the defendant, must grant a severance of offenses whenever:
>
> > (1) If before trial, it is found necessary to promote a fair determination of the defendant's guilt or innocence of each offense; or
> >
> > (2) If during trial, upon motion of the defendant . . . , it is found necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court must consider whether, in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.
>
> (c) Objection to Joinder of Charges against Multiple Defendants for Trial; Severance.
>
> > (1) When a defendant objects to joinder of charges against two or more defendants for trial because an out-of-court statement of a codefendant makes reference to him . . . , the court must require the prosecutor to select one of the following courses:
> >
> > > a. A joint trial at which the statement is not admitted into evidence; or
> > >
> > > b. A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been effectively deleted so that the statement will not prejudice him; or
> > >
> > > c. A separate trial of the objecting defendant.

(2) The court, on motion of the prosecutor, or on motion of the defendant other than under subdivision (1) above must deny a joinder for trial or grant a severance of defendants whenever:

   a. If before trial, it is found necessary to protect a defendant's right to a speedy trial, or it is found necessary to promote a fair determination of the guilt or innocence of one or more defendants; or

   b. If during trial, upon motion of the defendant whose trial is to be severed, . . . it is found necessary to achieve a fair determination of the guilt or innocence of that defendant.

N.C.G.S. § 15A-927(b), (c)(1), (2). We review the trial court's decision in this regard under the abuse-of-discretion standard. *State v. Porter,* 303 N.C. 680, 688, 281 S.E.2d 377, 383 (1981).

There is a strong policy in North Carolina favoring the consolidation of the cases of multiple defendants at trial when they may be held accountable for the same criminal conduct. *State v. Paige,* 316 N.C. 630, 643, 343 S.E.2d 848, 857 (1986). Severance is not appropriate merely because the evidence against one codefendant differs from the evidence against another. *See, e.g., State v. Nelson,* 298 N.C. 573, 586-88, 260 S.E.2d 629, 640-41 (1979), *cert. denied,* 446 U.S. 929, 64 L. Ed. 2d 282 (1980). The differences in evidence from one codefendant to another ordinarily must result in a conflict in the defendants' respective positions at trial of such a nature that, in viewing the totality of the evidence in the case, the defendants were denied a fair trial. *Id.* at 587, 260 S.E.2d at 640. However, substantial evidence of the defendants' guilt may override any harm resulting from the contradictory evidence offered by them individually. *Id.* at 588, 260 S.E.2d at 641.

With respect to the testimony involving statements made by Barnes' codefendants, we noted in *Paige* that "we often rely on the common sense of the jury, aided by appropriate instructions of the trial judge, not to convict one defendant on the basis of evidence which relates only to the other." *Paige,* 316 N.C. at 643, 343 S.E.2d at 857. While Barnes contends that the limiting instructions given by the trial court were ineffective in preventing the jury from using the statements as substantive evidence against him, thereby precluding a

STATE v. BARNES

[345 N.C. 184 (1997)]

fair determination of his guilt, he has failed to show that the trial court abused its discretion. We explained in *Paige* that if introduction of some evidence incriminating only one codefendant always "required a severance of the defendants' trials, we would in effect be ruling that co-defendants may not be joined for trial in this state. It would be unusual for all evidence at a joint trial to be admissible against [all] defendants . . . ." *Id.* The trial court here offered limiting instructions at the times the statements were introduced. As Barnes has failed to show an abuse of discretion in the trial court's actions, this argument is therefore without merit.

[12] Barnes' contention that the differences in the evidence against him when compared with evidence against his codefendants prevented a fair determination of his guilt is equally unpersuasive. Barnes contends that the "overwhelming" evidence incriminating Blakney and Chambers—including DNA and fingerprint evidence, the numerous inculpatory statements made by both codefendants, and testimony that both codefendants were seen the night of the murders with articles belonging to the Tutterows and sold one of the Tutterow guns used in the murders—created a substantial risk that jurors overlooked the weakness of the State's case against him. We find no error in this regard.

Evidence is relevant, and therefore generally admissible, "if it has any logical tendency, however slight, to prove a fact in issue." *Moore,* 335 N.C. at 601, 440 S.E.2d at 816. Similarly, evidence may be admissible where it is not directly probative of the crime charged if it pertains to the " 'chain of events explaining the context, motive and set-up of the crime . . . [and is] linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.' " *State v. Agee,* 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990) (quoting *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir. 1985)) (second alteration in original). Evidence may also be admissible under the principle of *res gestae,* which provides for the admission of evidence involving a continuing criminal transaction that is " 'so closely connected to [an] occurrence or event in both time and substance as to be a part of the happening.' " *State v. Baker,* 336 N.C. 58, 63, 441 S.E.2d 551, 554 (1994) (quoting *Black's Law Dictionary* 1305 (6th ed. 1990)). Much of the evidence that Barnes contends overwhelmed the jurors, thereby compelling them to disregard the weak case against him, would have been admissible against him in a separate trial under such rules. In any event, assuming

*arguendo* that some of the aforementioned evidence would not have been admissible against Barnes in a separate proceeding, this fact nonetheless did not entitle Barnes to severance. Again, we "rely on the common sense of the jury, aided by appropriate instructions of the trial judge, not to convict one defendant on the basis of evidence which relates only to the other." *Paige*, 316 N.C. at 643, 343 S.E.2d at 857. Barnes' arguments are therefore without merit.

[13] Similarly, defendant Chambers has not shown an abuse of discretion in the trial court's denial of his motion for severance. Chambers argues that Blakney's statements (discussed above with regard to the arguments of Barnes) prejudiced him, thereby preventing a fair determination of his guilt. We again note the strong policy favoring the consolidated trials of defendants accused of collective criminal behavior. Given the limited evidence at issue in this assignment of error, our trust in the common sense of the jury, and the limiting instructions of the trial court, we conclude that Chambers' argument is without merit.

[14] Defendant Blakney contends that the introduction of his statements in a sanitized or redacted form denied him a fair trial. Blakney argues that admitting the confessions in their original form would have demonstrated that he was merely a passive participant in the crimes. He contends that the admission of the redacted statements resulted in the jury's (1) inferring that he did not cooperate with the police in identifying his codefendants; and (2) inferring that he, rather than his codefendants, committed some of the acts that he described in his statements to police.

As noted previously, the Supreme Court's decision in *Bruton* provides that in joint trials of defendants, extrajudicial confessions of nontestifying defendants should be excluded unless all portions implicating codefendants other than the declarant-defendant can be removed without prejudice either to the declarant-defendant or to the State. *See Bruton*, 391 U.S. at 126, 135-36, 20 L. Ed. 2d at 479, 485; *Fox*, 274 N.C. at 291, 163 S.E.2d at 502. If the removal of those portions in this manner is not possible, the State may either choose not to introduce the confession or may try the defendants separately. *Id.* Again, we examine the trial court's actions under the abuse-of-discretion standard. *Porter*, 303 N.C. at 688, 281 S.E.2d at 383.

While Blakney frames his participation in the crimes here as passive, the evidence against him at trial was sufficient for a finding of guilt on the theory of acting in concert. Any passivity on the part of

Blakney was a consideration more appropriate for sentencing. While Blakney cites *State v. Boykin*, 307 N.C. 87, 296 S.E.2d 258 (1982), and *State v. Alford*, 289 N.C. 372, 222 S.E.2d 222, *death sentence vacated*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976), in support of his argument for severance, we find those cases to be inapposite. Those cases dealt with circumstances in which the refusal of the trial court to grant severance interfered with a defendant's opportunity to use a confession to his advantage where the defendants had antagonistic defenses. *See Boykin*, 307 N.C. at 91-92, 296 S.E.2d at 260-61 (defendant was unable to explain that he gave false statements to protect his codefendant brother); *Alford*, 289 N.C. at 385-89, 222 S.E.2d at 231-33 (defendant was unable to use confession of codefendant more fully to support his alibi).

In this case, Blakney merely argues that, notwithstanding other evidence presented at trial, his own unredacted confession could have been used to show that he was a passive participant in the crimes. The redaction here does not rise to the level of the exclusion of the statements in *Boykin* or *Alford*, both of which involved severely censored statements going to the heart of the accused's defense that would have been available had the cases not been joined. We therefore conclude that the trial court's ruling denying severance to Blakney was not "so arbitrary that it could not have been the result of a reasoned decision," *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985), and find Blakney's argument to be without merit.

**[15]** The final matter for our examination in these assignments of error concerns the trial court's denial of motions by defendants Barnes and Chambers for severance at the capital sentencing proceeding. Barnes and Chambers argue that the testimony of their codefendant Blakney at sentencing prejudiced them, thereby denying them their respective rights to a fair capital sentencing proceeding. Blakney testified at sentencing that he did not shoot the Tutterows, that Barnes and Chambers did shoot the Tutterows while he was in another room, and that he had not planned to kill anyone during the robbery. Neither Barnes nor Chambers testified during the sentencing hearing.

The capital sentencing proceeding in this case did not involve a contest between defendants viewed passively by the State. Barnes and Chambers did not testify at sentencing, nor did they put forth any evidence challenging the testimony of their codefendant. We have

noted that in a case involving one codefendant who testified while the other did not, the silent defendant "was not forced to accept [the other's] story tacitly or otherwise. [He] had a right to tell his own story, a right which for whatever reason he freely chose not to exercise." *State v. Belton*, 318 N.C. 141, 149, 347 S.E.2d 755, 760 (1986). This reasoning applies with even greater force where the silent defendants had already been convicted and were facing sentencing.

Barnes and Chambers rely on *State v. Pickens*, 335 N.C. 717, 440 S.E.2d 552 (1994), in support of their argument for severance. *Pickens* involved a situation in which each defendant put forth evidence indicating that the other defendant was the guilty party, thereby creating an irreconcilable conflict in the evidence through antagonistic defenses. *Id.* at 726-28, 440 S.E.2d at 557-58. The differences in evidence in this capital sentencing proceeding did not result in such antagonistic defenses as to deny a fair capital sentencing proceeding; each defendant could show why he should not receive the death penalty without arguing that the others should. These assignments of error are overruled.

[16] In another assignment of error, defendants contend that the trial court abused its discretion in its handling of a juror who volunteered that he had spoken with his brother about defendants Blakney and Chambers during the trial. During the State's presentation of evidence, a juror informed the trial court that "[i]t was brought to my attention yesterday by my brother that he had known Mr. Blakney and Mr. Chambers while he served time in prison. And he had known them fairly well. I just thought that I should," at which point the trial court thanked the juror. The trial court asked whether the juror and his brother had discussed the case, to which the juror responded that they had not. The trial court made no further inquiry into this incident, and defendants did not object at trial.

While there is no statutory provision in North Carolina dealing with challenges to a juror after the jury has been impaneled, *see State v. Richardson*, 341 N.C. 658, 672-73, 462 S.E.2d 492, 502 (1995), trial courts have the discretion to supervise the jury after jury selection and may excuse a juror and substitute an alternate when necessary, *State v. Lovin*, 339 N.C. 695, 715-16, 454 S.E.2d 229, 241 (1995). In *State v. Garner*, 340 N.C. 573, 601, 459 S.E.2d 718, 733 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 872 (1996), we held that in dealing with an outside contact with a juror, the trial court's duty is to determine whether the contact at issue resulted in substantial and

irreparable prejudice to the defendant and that the scope of the inquiry is within the discretion of the trial court.

After the juror volunteered the information, the trial court in this case asked whether the juror had discussed the case with his brother. The trial court was in a position to observe and scrutinize the juror's credibility with respect to the juror's response to the question and was satisfied that the juror had not been tainted by the contact with the brother. We cannot say that the trial court's actions in this respect were so arbitrary that they could not have been the result of a reasoned decision. *Richardson*, 341 N.C. at 673, 462 S.E.2d at 502. Therefore, this assignment of error is overruled.

**[17]** In related assignments of error, defendants argue that the trial court abused its discretion in its disposition of other issues concerning juror misconduct. After the jury returned its sentencing recommendations, defense counsel made an assertion to the trial court that a juror had taken a Bible into the jury room and read to the jury members from it before deliberations and that another juror called a minister to ask a question about the death penalty. The following exchange took place:

> THE COURT: No evidence that anybody discussed the particular facts of this case with anybody outside the jury. Is that correct?
>
> [DEFENSE COUNSEL]: No evidence that they did or did not as far as the conversation with the minister is concerned.
>
> THE COURT: No evidence that they did though. Is that correct?
>
> [DEFENSE COUNSEL]: No, sir.
>
> THE COURT: All right. Well, I'm going to deny the request to start questioning this jury about what may or may not have taken place during their deliberations of this trial.

Defense counsel moved for a mistrial, new trial, new sentencing, to set aside the verdict, and for appropriate relief, and the trial court denied the motions.

Defendants contend that the trial court erred in failing to conduct an investigation to determine what, if any, prejudice resulted from the alleged events. In *State v. Bonney*, 329 N.C. 61, 83, 405 S.E.2d 145, 158 (1991), we held that "[t]he determination of the existence and effect

of jury misconduct is primarily for the trial court[,] whose decision will be given great weight on appeal." We noted in *State v. Williams*, 330 N.C. 579, 583, 411 S.E.2d 814, 817 (1992), that the trial court has the responsibility to conduct investigations to this effect, including examination of jurors when warranted, to determine whether any misconduct has occurred and has prejudiced the defendant. An inquiry into possible misconduct is generally required only where there are reports indicating that some prejudicial conduct has taken place. *State v. Harrington*, 335 N.C. 105, 115, 436 S.E.2d 235, 240-41 (1993). The scope of this inquiry is within the sound discretion of the trial court. *Willis*, 332 N.C. at 173, 420 S.E.2d at 168.

In this case, defense counsel simply made a conclusory statement, without giving any source, that a juror read passages from the Bible aloud in the jury room prior to deliberations and prior to the trial court's instructions to the jury. It is well established that a defendant has the right to a trial by an impartial jury and a verdict based only on the evidence developed at trial. *Turner v. Louisiana*, 379 U.S. 466, 471-72, 13 L. Ed. 2d 424, 428-29 (1965). Courts throughout the United States have generally concluded that a jury's reliance on extraneous sources during deliberations is error. *See, e.g., Gibson v. Clanon*, 633 F.2d 851 (9th Cir. 1980) (jury consulted medical text concerning blood types and medication), *cert. denied*, 450 U.S. 1035, 68 L. Ed. 2d 231 (1981); *Kirby v. Rosell*, 133 Ariz. 42, 648 P.2d 1048 (1982) (jury consulted business law text); *Alvarez v. People*, 653 P.2d 1127 (Colo. 1982) (jury consulted dictionary); *Brockie v. Omo Construction, Inc.*, 255 Mont. 495, 844 P.2d 61 (1992) (jury consulted library books dealing with subject of technical expert's testimony). Rule 606(b) of the North Carolina Rules of Evidence indicates that a juror may testify as to matters occurring during deliberation with respect to the question "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." N.C.G.S. § 8C-1, Rule 606(b) (1992). "Extraneous information" is information dealing with the defendant or the case at bar that reaches a juror without being introduced into evidence. *State v. Rosier*, 322 N.C. 826, 832, 370 S.E.2d 359, 363 (1988).

Courts in other jurisdictions have dealt with the issue before us in a number of ways. In *People v. Mincey*, 2 Cal. 4th 408, 827 P.2d 388, 6 Cal. Rptr. 2d 822, *cert. denied*, 506 U.S. 1014, 121 L. Ed. 2d 567 (1992), the California Supreme Court concluded that there was no substantial likelihood that defendant was prejudiced by jurors read-

ing a Bible in the jury room during deliberations where the judge admonished the jury before deliberations resumed to decide the case solely on the evidence. *Id.* at 467, 827 P. 2d at 425, 6 Cal. Rptr. 2d at 859. Similarly, in *People v. Vigil*, 718 P.2d 496, 501-02 (Colo. 1986), the Colorado Supreme Court found no abuse of discretion where the trial court concluded that defendant had not been prejudiced by a juror reading aloud from a Bible in the jury room. In *Jones v. Francis*, 252 Ga. 60, 61, 312 S.E.2d 300, 303, *cert. denied*, 469 U.S. 873, 83 L. Ed. 2d 157 (1984), the Georgia Supreme Court held that allowing a Bible in the jury room during deliberations was harmless error where defense counsel used biblical references in closing argument.

In this case, we are faced with an unsubstantiated assertion that a juror read Bible verses before deliberations began. The trial court instructed the jury before deliberations and after the allegation concerning the Bible reading as follows:

It is now your duty to decide from all the evidence presented in both phases what the facts are. You must then apply the law which I am about to give you concerning punishment to those facts. It is absolutely necessary that you understand and apply the law as I give it to you and not as you think it is or as you might like it to be. This is important because justice requires that everyone who is sentenced for first-degree murder have the sentence recommendation determined in the same manner and have the same law applied to him.

. . . .

. . . [Y]ou've heard the evidence and the arguments of counsel for the State and for the defendant. I have not summarized the evidence in this case, but it's your duty to remember all of the evidence, whether it's been called to your attention or not. If your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your own independent recollection of the evidence in your deliberations. Now, I have not reviewed the contentions of the State or those of the defendant[s], but it is your duty not only to consider all of the evidence, but also to consider all the arguments, the contentions and positions urged by the attorneys in their speeches to you, and any other contention that arises from the evidence, and to weigh them in light of your own common sense, and, as best as you can, to make your recommendation as to punishment.

Assuming *arguendo* that defense counsel's assertions were accurate, there still was no assertion that the juror's reading from the Bible was accomplished in the context of any discussion about the case itself or that it involved extraneous influences as defined by this Court. The issue, therefore, is whether the trial court abused its discretion by failing to inquire further into the alleged Bible-reading incident when faced with the mere assertion that a juror read the Bible aloud in the jury room prior to the commencement of deliberations and prior to the trial court's instructions to the jury. As there is no evidence that the alleged Bible reading was in any way directed to the facts or governing law at issue in the case, we cannot say that the trial court's actions were an abuse of discretion.

With respect to a juror's alleged actions in calling a clergy member, a similar analysis applies. The trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty. Nothing in this assertion involved "extraneous information" as contemplated in our Rule 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case. We cannot say under the particular circumstances of this case that the trial court's actions in failing to probe further into the sanctity of the jury room was an abuse of discretion. These assignments of error are therefore without merit.

[18] Defendants next contend that the trial court committed prejudicial error in instructing the jury on the doctrine of acting in concert with regard to premeditated and deliberate first-degree murder. The trial court offered the same basic substantive instruction on acting in concert with respect to all three defendants:

> [T]here is a [principle] in our law known as acting in concert. For a person to be guilty of a crime, it is not necessary that he himself do all of the acts necessary to constitute the crime. If two or more persons act together with a common purpose to commit a crime, each of them is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the others in pursuance of the common purpose or as a natural or probable consequence of the common purpose.

STATE v. BARNES

[345 N.C. 184 (1997)]

Now, I charge that for you to find the defendant guilty of first degree murder on the basis of malice, premeditation and deliberation, the State must prove five things to you and prove each of them beyond a reasonable doubt. First, that the defendant, *or someone with whom he was acting in concert*, intentionally and with malice killed the victim with a deadly weapon. . . . [M]alice means not only hatred, ill will or spite as it is ordinarily understood, but it also means that condition of mind that prompts a person to take the life of another intentionally or to intentionally inflict a wound with a deadly weapon upon another which proximately results in his death, without just cause, excuse or justification. If the State proves beyond a reasonable doubt that the defendant, *or someone with whom he was acting in concert*, intentionally killed the victim with a deadly weapon or intentionally inflicted a wound upon the victim with a deadly weapon, that proximately caused his death, you may infer first that the killing was unlawful, and second, that it was done with malice, though you are not compelled to do so. . . . [S]econd[,] the State must prove that the defendant's act *or the act of someone with whom he was acting in concert* was a proximate cause of the victim's death. . . . Third, the State must prove that the defendant, *or someone with whom he was acting in concert*, intended to kill the victim.

. . . Fourth, that the defendant, *or someone with whom he was acting in concert*, acted after premeditation. . . . [F]ifth, that the defendant, *or someone with whom he was acting in concert*, acted with deliberation, which means that he acted while he was in a cool state of mind. Now, this does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant, *or someone with whom he was acting in concert*, was in a state of passion or excited when the intent was carried into effect. Now, neither premeditation nor deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the lack of provocation by the victim, the conduct of the defendant before, during and after the killing, the use of grossly excessive force, the infliction of lethal wounds after the victim is felled, the brutal or vicious circumstances of the killing, and the manner in which or means by which the killing was done.

(Emphasis added.) Defendants argue that this instruction violates North Carolina law as defined in this Court's ruling in *State v. Blankenship,* 337 N.C. 543, 447 S.E.2d 727 (1994), by permitting the jury to find defendants guilty of premeditated and deliberate first-degree murder without specific findings that they individually possessed the requisite *mens rea* to commit that crime. For the reasons that follow, we now overrule *Blankenship* and its progeny.

This Court's decision in *Blankenship* was its latest major effort in its recent sinuous course of jurisprudence with respect to the law on acting in concert and overruled long-settled law. At the time of this Court's decision in *State v. Westbrook,* 279 N.C. 18, 181 S.E.2d 572 (1971), *death sentence vacated,* 408 U.S. 939, 33 L. Ed. 2d 761 (1972), the law was clear. In *Westbrook,* the trial court

> charged the jury correctly that the mere presence of a person at the scene of a crime at the time of its commission does not make him guilty of the offense, but that if two persons are acting together, in pursuance of a common plan and common purpose to rob, and one of them actually does the robbery, both would be equally guilty within the meaning of the law and if "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose; that is, the common plan to rob, or as a natural or probable consequence thereof."

*Id.* at 41-42, 181 S.E.2d at 586. This Court held that these instructions were proper. *Id.* In *State v. Reese,* 319 N.C. 110, 353 S.E.2d 352 (1987), however, a majority of this Court deviated from the course set in *Westbrook.* The majority in *Reese* cited *Westbrook,* but then stated by *dicta* in a footnote and without reference to any authority that *Westbrook* did not "change the rule that, for crimes requiring a specific *mens rea,* that *mens rea* must be shown as to each defendant." *Id.* at 141-42 n.8, 353 S.E.2d at 370 n.8. The *Reese* majority concluded that there was no evidence suggesting that the defendant knew that the killer he acted in concert with had intended to kill the victim and that defendant therefore could not be found guilty of first-degree murder on a theory of acting in concert. *Id.* at 144-45, 353 S.E.2d at 371-72.

This Court again examined instructions involving the acting in concert doctrine in *State v. Erlewine,* 328 N.C. 626, 403 S.E.2d 280

(1991). In *Erlewine*, we reexamined the law in the context of a trial court's instructions to the jury that "you should be aware of the law which provides that for a person to be guilty of a crime it is not necessary that he himself do all the acts necessary to constitute that crime. If two or more persons act together *with a common purpose to commit a crime* each of them is held responsible for the acts of the others done in the commission of that crime." *Id.* at 635, 403 S.E.2d at 285. The defendant in *Erlewine* argued that those instructions improperly relieved the State of its burden to prove that the defendant had the required *mens rea* for both first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury. We held that "the correct statement of the law," *id.* at 637, 403 S.E.2d at 286, was set out by the trial court in *Westbrook* as follows:

> [I]f "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."

*Id.* at 637, 403 S.E.2d at 286 (quoting *Westbrook*, 279 N.C. at 41-42, 181 S.E.2d at 586) (alterations in original).

Three years after *Erlewine*, this Court dealt once more with instructions on acting in concert in *Blankenship*. In that case, we concluded that the acting in concert doctrine did not encompass a defendant who was at the scene of a murder acting in concert with another with whom he shared a common plan to commit a crime, but who did not have the specific intent to kill the victim. *Blankenship*, 337 N.C. at 560-62, 447 S.E.2d at 738-39. While we have since ruled in accordance with *Blankenship* in a number of cases involving instructions on acting in concert, *see, e.g., State v. Straing*, 342 N.C. 623, 466 S.E.2d 278 (1996), today we overrule our decision in *Blankenship* and, returning to a body of law which was well established and long-standing in this jurisdiction prior to *Reese* and *Blankenship*, conclude that the instructions given in the case *sub judice* were not erroneous.

The first instances in which this Court dealt with the concerted actions of multiple defendants date back at least 160 years. In *State v. Haney*, 19 N.C. 390 (1837), we noted that "where a privity and community of design has been established, the act of any one of those who have combined together for the same illegal purpose, done in

furtherance of the unlawful design, is, in the consideration of law, the act of all." *Id.* at 395. We ruled similarly in *State v. Simmons*, 51 N.C. 21, 24-25 (1858), finding it "a well established principle[] that where two agree to do an unlawful act, each is responsible for the act of the other, provided it be done in pursuance of the original understanding, *or* in furtherance of the common purpose." (Emphasis added.) Following the doctrine of *stare decisis*, we continued to follow the "well established principle" of *Haney* and *Simmons* in all of the years prior to the *Reese* decision. *See, e.g., State v. Butler*, 269 N.C. 733, 736-37, 153 S.E.2d 477, 481 (1967); *State v. Kelly*, 243 N.C. 177, 181, 90 S.E.2d 241, 244 (1955); *State v. Smith*, 221 N.C. 400, 405, 20 S.E.2d 360, 364-65 (1942); *State v. Davis*, 203 N.C. 13, 28, 164 S.E. 737, 745, *cert. denied*, 287 U.S. 649, 77 L. Ed. 561 (1932); *State v. Oxendine*, 187 N.C. 658, 661-62, 122 S.E. 568, 570 (1924); *State v. Knotts*, 168 N.C. 173, 180-81, 83 S.E. 972, 979 (1914); *State v. Finley*, 118 N.C. 1162, 1171, 24 S.E. 495, 499 (1896); *State v. Gooch*, 94 N.C. 987, 1014 (1886). In more recent cases, after *Reese* but prior to *Blankenship*, we continued to follow the doctrine as stated in our prior cases and as reaffirmed in *Westbrook*. *See, e.g., State v. Harvell*, 334 N.C. 356, 364, 432 S.E.2d 125, 129 (1993); *State v. Laws*, 325 N.C. 81, 97, 381 S.E.2d 609, 618-19 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990); *State v. Oliver*, 309 N.C. 326, 362, 307 S.E.2d 304, 327 (1983); *State v. Joyner*, 297 N.C. 349, 357-58, 255 S.E.2d 390, 395-96 (1979).

The instructions in this case are identical in substance to those found defective in *Blankenship*. The trial court instructed the jurors in the case *sub judice* with respect to all three defendants that the law on acting in concert was as follows:

If two or more persons act together with a common purpose to commit a crime, each of them is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the others in pursuance of the common purpose or as a natural or probable consequence of the common purpose.

In *Blankenship*, the trial court gave the following charge to the jury with respect to the acting in concert doctrine:

For a person to be guilty of a crime, it is not necessary that he, himself, do all the acts necessary to constitute the crime. If a defendant is present, with one or more persons, and acts together with a common purpose to commit murder, *or* to commit kidnap-

STATE v. BARNES

[345 N.C. 184 (1997)]

ping, each of them is held responsible for the acts of the others, done in the commission of the murder *or* kidnapping, as well as any other crime committed by the other in furtherance of that common design.

*Blankenship*, 337 N.C. at 555, 447 S.E.2d at 734-35. The instructions both in this case and in *Blankenship* informed the jurors that in applying the doctrine of acting in concert, they would find a defendant guilty of premeditated murders committed by another if they found that the defendant acted with the other in a common purpose to commit a crime and that the murders were committed by the other as a probable consequence of that common purpose.

We now overrule *Blankenship* and conclude that the trial court's instructions in this case were not erroneous. The correct statement of the doctrine of acting in concert in this jurisdiction is that enumerated in *Westbrook* and *Erlewine*:

[I]f "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."

*Erlewine*, 328 N.C. at 637, 403 S.E.2d at 286 (quoting *Westbrook*, 279 N.C. at 41-42, 181 S.E.2d at 586) (alterations in original). To the extent that *Blankenship*, *Reese*, and their progeny are inconsistent with this opinion, they are hereby overruled.

As this Court has stated in another context, "This decision is hardly novel or revolutionary. Rather, the Court merely reverts . . . to a well established principle of law, thoroughly familiar to generations of lawyers and jurists. Nothing in our above-cited cases . . . indicates that this long-standing principle has proven inscrutable or unworkable." *State v. White*, 322 N.C. 506, 518, 369 S.E.2d 813, 819 (1988). "[N]othing is settled [under the doctrine of *stare decisis*] until it is settled right." *Rabon v. Hospital*, 269 N.C. 1, 20, 152 S.E.2d 485, 498 (1967). We return today to the law as it was stated and applied in *Westbrook* and our earlier cases and as reapplied in *Erlewine*.

[19] We now turn to the issue of the application of our decision to overrule *Blankenship* to this case. The return to the acting in concert instructions as enumerated in *Erlewine* does not act as an *ex post facto* law in this case. An *ex post facto* law may be defined, as rele-

vant here, as a law that "allows imposition of a different or greater punishment than was permitted when the crime was committed." *State v. Vance*, 328 N.C. 613, 620-21, 403 S.E.2d 495, 500 (1991). There are two critical elements to an *ex post facto* law: that it is applied to events occurring before its creation and that it disadvantages the accused that it affects. *Id.* While the *ex post facto* law as constitutionally defined involves only legislative enactments, *see* U.S. Const. art. I, § 10; N.C. Const. art. I, § 16, the Supreme Court held in *Marks v. United States*, 430 U.S. 188, 191-92, 51 L. Ed. 2d 260, 264-65 (1977), that the Fifth and Fourteenth Amendments to the Constitution of the United States also forbid the retrospective application of an unforeseeable judicial modification of criminal law to the detriment of the defendant in the case at issue. *Accord Vance*, 328 N.C. at 620-21, 403 S.E.2d at 500; *State v. Waddell*, 282 N.C. 431, 446, 194 S.E.2d 19, 29 (1973).

The crimes at issue in this case were committed on 29 October 1992, and defendants were sentenced for those crimes on 10 March 1994. The certification date of our decision in *Blankenship* did not occur until the later date of 29 September 1994. Therefore, the law on acting in concert in North Carolina at all relevant times during the disposition of this case was the rule as stated in *Erlewine*, which we reaffirm today. Our ruling today that with regard to this case, the trial court's instructions on acting in concert were proper therefore does not violate the constitutional prohibitions against *ex post facto* laws, and these defendants' assignments of error are without merit.

## ARGUMENTS OF DEFENDANTS BARNES AND CHAMBERS

[20] Defendants Barnes and Chambers contend in other assignments of error that the trial court erred in its peremptory instructions on nonstatutory mitigating circumstances in the capital sentencing proceeding, arguing that the instruction as given could have been interpreted to place a higher evidentiary burden on defendant than was proper. The trial court instructed the jury with respect to one of the nonstatutory mitigators that "[y]ou would find this mitigating circumstance if you find that the defendant's father [or mother] abused alcohol, and all of the evidence tends to show that this is true, and if you find that this circumstance has mitigating value." Barnes and Chambers argue that this instruction could be interpreted to mean that a juror could find the circumstance only after the juror herself found that all of the evidence showed that the fact at issue was true. In *State v. Buckner*, 342 N.C. 198, 235, 464 S.E.2d 414, 435 (1995),

*cert. denied* —— U.S. ——, 136 L. Ed. 2d 47 (1996), we noted that the peremptory instructions for nonstatutory mitigators differ from those for statutory mitigators in that a juror may consider a nonstatutory mitigator found by her to be without mitigating value. A peremptory instruction for a nonstatutory mitigating circumstance should reflect this distinction. *Id.* The construction offered by Barnes and Chambers is contrary to the syntax of the sentence, and the trial court explained this syntax using verbal punctuation:

> THE COURT: I'm saying if you find that his mother abused alcohol, comma, and all the evidence tends to show that this is true, comma.

> [DEFENSE COUNSEL]: Okay. So you're not telling them that the evidence does in fact show that?

> THE COURT: I'm telling them it tends to show that. I'm not telling them that's what it does show. It's for them to accept or reject.

> . . . .

> [PROSECUTOR]: Your Honor, I don't feel that it is [ambiguous] either, although it's hard to get the inflection on the record. It's quite clear the Court is saying the evidence tends to show all of this is true.

The peremptory instructions in this case therefore were legally correct, as they reflected the distinction between the statutory and nonstatutory mitigators, advised the jury that all of the evidence in the case tended to support the nonstatutory mitigating circumstance, and allowed but did not require the jury to find the circumstance. These assignments of error are without merit.

[21] By another assignment of error, defendants Barnes and Chambers argue that the trial court erred by failing to give a limiting instruction on the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that each murder was especially heinous, atrocious, or cruel. By this assignment, Barnes and Chambers do not argue that the (e)(9) circumstance was inapplicable in this case. Rather, they contend that the instruction given by the court permitted the jury to find vicariously the aggravating circumstance for one defendant based on the actions and specific intent of another defendant. Defendants argue that the trial court should have instructed the jury that it had to consider each defendant's individual behavior and intent in determining

whether the (e)(9) circumstance aggravated that defendant's culpability for the murders.

While Barnes and Chambers raised a general objection to the submission of the heinous, atrocious, or cruel circumstance, neither requested a limiting instruction on the circumstance. Thus, we review this alleged instructional error under the plain error rule. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983).

We conclude that the instruction given by the trial court, based on N.C.P.I.—Crim. 150.10, was neither an error that had an impact on the jury's findings nor a mistake so fundamental as to amount to a miscarriage of justice. *Id.* at 660, 300 N.C. at 378. The instruction at issue here, which we have said to be correct as a matter of law, *State v. Syriani*, 333 N.C. 350, 388-91, 428 S.E.2d 118, 139-40, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993), apprised the jury with respect to what it must find for each murder to have been "especially heinous, atrocious, or cruel." The trial court instructed the jury separately for each defendant, enumerating the aggravating and mitigating circumstances individually for each murder count. Moreover, the court premised its capital sentencing instructions to the jury with the following limiting instruction:

> Members of the Jury, I am now going to instruct you on the law which you are to follow as you decide what the appropriate punishment shall be in these cases. I want to once again caution you that all of these cases have been joined for trial to be tried at the same time for various reasons. However, in your consideration as to the appropriate punishment in each of these cases, you are to consider each case and each individual defendant separately. That is, you are to determine the appropriate punishment on the merits as you find them to be under the instructions which I will give you as to each individual separately.

Our conclusion is also supported by the jury's factual findings relating to accomplice liability. During the guilt-innocence phase of the trial, the jury determined that for both murder counts, Barnes and Chambers each (1) killed or attempted to kill the victim, (2) intended to kill the victim, (3) intended that deadly force would be used in the course of the underlying felony, or (4) was a major participant in the underlying felony and exhibited reckless indifference to human life. Furthermore, the jury failed during the sentencing proceeding to find the existence of the N.C.G.S. § 15A-2000(f)(4) mitigating circumstance, that defendant was an accomplice in or accessory to the cap-

STATE v. BARNES

[345 N.C. 184 (1997)]

ital felony committed by another person and his participation was relatively minor, for either Barnes or Chambers. The jury did find, however, that the (f)(4) mitigating circumstance existed with respect to Blakney. These findings tend to show that, for capital sentencing purposes, the jury adhered to the trial court's instruction to consider each defendant's involvement and culpability distinctly and that the jury did not find facts vicariously against one defendant based on the actions or intent of another. We cannot conclude that the instruction with respect to the (e)(9) aggravating circumstance was plain in error. This assignment of error is therefore overruled.

## ARGUMENTS OF DEFENDANTS BARNES AND BLAKNEY

[22] In another assignment of error, defendants Barnes and Blakney contend that the trial court committed reversible constitutional error in overruling Barnes' objections to closing arguments made by the State during the capital sentencing proceeding. We note that Barnes and Blakney made no constitutional claims at trial concerning the State's closing arguments and will not be heard on any constitutional grounds now. N.C. R. App. P. 10(b)(1); *see, e.g., State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988).

[23] A defendant is not entitled to a new trial because of an improper prosecutorial comment, properly objected to, unless the comment amounted to prejudicial error. *State v. Ingle*, 336 N.C. 617, 650-51, 445 S.E.2d 880, 898 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 222 (1995). Barnes first contends that the prosecutor acted with gross impropriety during closing argument by lying on the floor to demonstrate a previous crime allegedly committed by Barnes. At the sentencing proceeding, the State introduced evidence tending to show that Barnes had committed an attempted robbery of a sixteen-year-old girl, Terry Hull. During her closing argument, assistant district attorney Symons, while lying on the floor, described Barnes' encounter with Ms. Hull:

> And they went skipping up the hill, hand in hand, these two sisters, and Mr. Barnes grabbed Terry [Hull] from behind, dragged her across the street with little sister Melissa still holding her hand, and he flung her down on the ground. And they fought and she screamed for help and he pinned her down with his knees on her arms, and he put his hands around her neck like this and choked her. Terry [Hull] told you that her breath was cut off. Terry [Hull] told you her eyes started to go. Her vision went; she couldn't see. She told you her head was red and felt like it was

going to explode. And she told you he would have killed me if that man didn't pull him off. It's a felony involving the use of violence.

[DEFENSE COUNSEL]: Objection to Ms. Symons['] argument from the floor.

THE COURT: Overruled.

Barnes maintains that Ms. Symons' act of lying on the floor served only to inflame the jury and detract jurors from their duty to reasonably weigh the sentencing evidence. We disagree.

Nothing in the record suggests that Ms. Symons did anything other than lie on the floor and describe Barnes' attack on Terry Hull. Defendant has failed to show why or how this was an improperly prejudicial "theatrical, inflammatory demonstration." We therefore conclude that the act did not amount to prejudicial error.

[24] Barnes and Blakney next argue that the prosecutor erroneously disregarded instructions by the trial court and argued to the jurors that they could use the same evidence to support the existence of more than one aggravating circumstance. Specifically, over Barnes' objection, the prosecutor encouraged the jury to consider Mr. Tutterow's "psychological torture," caused by observing Mrs. Tutterow's death, in determining the existence of the heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9) (1988) (amended 1994). The prosecutor encouraged the jury later in her argument to use the same evidence, the death of Mrs. Tutterow, to find the existence of the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11).

"Double-counting" occurs when two aggravating circumstances are based on the same evidence. State v. Howell, 335 N.C. 457, 474-75, 439 S.E.2d 116, 126 (1994). Nonetheless, some overlap in the evidence is permissible; aggravating circumstances are not redundant unless there is a complete overlap of evidence supporting them. State v. Moseley, 338 N.C. 1, 54, 449 S.E.2d 412, 444 (1994), cert. denied, ——— U.S. ———, 131 L. Ed. 2d 738 (1995).

Barnes and Blakney concede that the trial court correctly instructed the jury not to find two or more aggravating circumstances from the same evidence. We fail to see any impropriety. The argument did not conflict with any of the trial court's instructions and did not

encourage the jury to ignore the instruction about not using the same evidence for finding two or more aggravating circumstances.

[25] Finally, Barnes and Blakney contend that the prosecutor misstated the law on mitigating circumstances. The prosecutor argued to the jury as follows:

> [R]ecall that each defendant has a separate set of mitigating circumstances and they have to prove them to you. The State does not have to disprove the mitigating circumstances. The defendant has to prove their existence. Now, here is the definition of mitigating circumstances. And each time you consider a mitigating circumstance say to yourself, does it reduce the moral culpability of the killing? Because you must find that to find that a circumstance has mitigating value.

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

"While the jury must accord mitigating value to a statutory mitigating circumstance found by it, the jury may deem a nonstatutory mitigating circumstance found by it to be without mitigating value." *Buckner*, 342 N.C. at 235, 464 S.E.2d at 435. Barnes maintains that the prosecutor's argument erroneously informed jurors that it was up to them to decide whether every mitigating circumstance, both statutory and nonstatutory, carried mitigating value.

Prosecutorial arguments are not examined in an isolated vacuum on appeal but must be considered in the context in which they were made. *Ingle*, 336 N.C. at 646, 445 S.E.2d at 895. Immediately after the trial court overruled Barnes' objection, the prosecutor went on to differentiate between statutory and nonstatutory mitigators. She stated that the jurors had to give some mitigating value to any statutory mitigating circumstance which they found to exist. Therefore, the argument was correct, and defendant was not prejudiced. For the foregoing reasons, we conclude that the arguments of the prosecutor during the capital sentencing proceeding in this case did not amount to prejudicial error. Accordingly, these assignments of error are overruled.

## ARGUMENTS OF DEFENDANT BARNES

[26] Defendant Barnes contends in an individual assignment of error that the trial court erred in not limiting its instruction on the doctrine of possession of recently stolen property to the burglary and robbery

charges. The trial court instructed the jury with respect to this doctrine that

> the State seeks to establish the defendants' guilt in part by the doctrine of recent possession. For this doctrine to apply, the State must prove three things beyond a reasonable doubt. First, that property was stolen; second, that the defendant had possession of this same property. Now, a person possesses property when he is aware of [its] presence and has, either by himself or together with others, both the power and intent to control its disposition or use. [Third], that the defendant had possession of this property so soon after it was stolen and under such circumstances as to make it unlikely that he obtained possession honestly. Now, if you find these things from the evidence beyond a reasonable doubt, you may consider them together with all other facts and circumstances in deciding whether or not the defendant is guilty of the crimes charged.

In *State v. Joyner*, 301 N.C. 18, 269 S.E.2d 125 (1980), we held that the trial court properly instructed the jury that it could consider as a relevant circumstance defendant's recent possession of stolen property in the determination whether defendant "was guilty of all the crimes charged against him, where, as here, all of the crimes . . . occurred as a part of the same criminal enterprise." *Id.* at 29, 269 S.E.2d at 132. We have used the "same criminal enterprise" test in several different contexts, including a felony murder in which the underlying felony was armed robbery. *See State v. Wilson*, 313 N.C. 516, 537, 330 S.E.2d 450, 463-64 (1985). Furthermore, in *State v. Mlo*, 335 N.C. 353, 377, 440 S.E.2d 98, 110, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 841 (1994), we noted that "[t]estimony concerning defendant's sudden and unprecedented possession of the victim's personal property immediately after the victim's murder is relevant to the issue of whether defendant was involved in the killing."

Barnes argues on appeal that the instructions allowed the jury to infer premeditation and deliberation from the fact that he had stolen goods in his possession shortly after the time of the murders. We do not agree.

As we stated in *Joyner*,

> "possession of stolen property recently after the theft, and under circumstances excluding the intervening agency of others[,] affords presumptive evidence that the person in possession is

himself the thief, and the evidence is stronger or weaker[] as the possession is nearer to or more distant from the time of the commission." *State v. Patterson*, 78 N.C. 470, 472-473 (1878). While the fact of recent possession has been said to raise a "presumption," it is more accurately deemed to raise a permissible inference that the possessor is the thief. *State v. Frazier*, 268 N.C. 249, 150 S.E.2d 431 (1966). "The presumption, or inference as it is more properly called, is one of fact and not of law. The inference derived from recent possession 'is to be considered by the jury merely as an evidentiary fact along with other evidence in the case, in determining whether the State has carried the burden of satisfying the jury beyond a reasonable doubt of the defendant's guilt.' " *State v. Fair*, 291 N.C. 171, 173, 229 S.E.2d 189, 190 (1976) [(quoting *State ·v. Baker*, 213 N.C. 524, 526, 196 S.E. 829, 830 (1938)]. The inference which arises, however, is that the possessor is the thief. *Id.*

*Joyner*, 301 N.C. at 28-29, 269 S.E.2d at 132. Therefore, the instruction informed the jurors that they were permitted, but not required, under the doctrine of recent possession to make the inference that Barnes stole the property in their determination whether Barnes committed the other crimes at issue. They were allowed, however, to use any such inference only to the extent appropriate according to the other instructions of the trial court in determining the guilt or innocence of the defendant with respect to the other crimes charged. For example, the trial court's instructions on the doctrine of recent possession in no way imply that the inference that a defendant stole property can be substituted for the jury's specific and independent findings as to whether Barnes premeditated and deliberated the killings. This assignment of error is therefore without merit.

[27] In another assignment of error, defendant Barnes contends that the trial court erred in denying his motion to dismiss the charges of first-degree murder as to him. Barnes argues that there was insufficient evidence to show premeditation and deliberation.

When ruling on a motion to dismiss, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992). If substantial evidence of each element is presented, the motion to dismiss is properly denied. *State v. Quick*, 323 N.C. 675, 682, 375 S.E.2d 156, 160 (1989). "Substantial evidence is relevant evi-

dence that a reasonable mind might accept as adequate to support a conclusion." *Olson*, 330 N.C. at 564, 411 S.E.2d at 595. The evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *Id.*

First-degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation. *State v. Skipper*, 337 N.C. 1, 26, 446 S.E.2d 252, 265 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Conner*, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* at 635, 440 S.E.2d at 836.

Taken in the light most favorable to the State, the gunshot residue evidence tended to show that Barnes shot the Tutterows. The evidence revealed that Barnes had fired a handgun or had handled a handgun soon after it was fired within a period close to the time of the killings. Furthermore, the fact that Barnes disposed of one of the murder weapons permits a reasonable inference that he had fired the weapon. The State's evidence also tended to show that Barnes demonstrated a willingness to kill someone at different times on the day of the murders. Barnes told Maurice Alexander that he would do anything he had to do to make a living and asked him if he had any enemies that he wanted Barnes to take out. Barnes threatened to shoot Robert Beatty and described a pistol in his possession as the one he had used to shoot Gil Gillespie a couple of weeks earlier. Based on this evidence, the jury could reasonably find that Barnes killed the victims after premeditation and deliberation. This assignment of error is therefore overruled.

## ARGUMENTS OF DEFENDANT BLAKNEY

[28] Defendant Blakney contends in an individual assignment of error that the trial court erred in its determination that he knowingly and intelligently waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), before making statements to police.

**STATE v. BARNES**

[345 N.C. 184 (1997)]

After he was arrested, Blakney confessed to the police both on 30 October 1992 and on 2 November 1992. The trial court conducted a suppression hearing on 24 January 1994 and concluded that Blakney "was in full understanding of his Constitutional right to remain silent and right to counsel and all other rights [when he confessed], and that he freely, knowingly, intelligently and voluntarily waived each of those rights and made statements to the officers." The trial court denied Blakney's motion to suppress, overruled his objection to the admission of the statements, and admitted redacted versions of the statements through the testimony of the police officers.

Blakney does not argue on appeal that the warnings given to him by police were somehow insufficient, nor does he argue that his statements were involuntary. Rather, he contends that he could not have understood his *Miranda* rights and that he therefore could not have waived them knowingly and intelligently. In *State v. Simpson*, 314 N.C. 359, 367, 334 S.E.2d 53, 59 (1985), this Court stated that the validity of a waiver as knowingly and intelligently executed depends on the specific facts and circumstances of the particular case, including the background, conduct, and experience of the accused. A defendant's waiver is valid if it is determined that his decision not to rely on his rights was not the product of coercion, that he was aware at all times that he could remain silent and request counsel, and that he was cognizant of the intention of the prosecution to use his statements against him. *Patterson v. Illinois*, 487 U.S. 285, 296-97, 101 L. Ed. 2d 261, 275 (1988). While the burden of showing a knowing and intelligent waiver is on the State, *Simpson*, 314 N.C. at 367, 334 S.E.2d at 59, evidence indicating that the accused did not fully appreciate the ramifications resulting from the waiver will "not defeat the State's showing that the information it provided to him satisfied the constitutional minimum." *Patterson*, 487 U.S. at 294, 101 L. Ed. 2d at 273.

Dr. John Frank Warren III, a psychologist, testified that he believed that Blakney's mental retardation, in addition to difficulties related to Blakney's consumption of alcohol in the period before his arrest, rendered him unable fully to understand his *Miranda* rights on 30 October 1992. Blakney, however, testified at the hearing that he understood that he had the right to talk to an attorney and the right to remain silent and reaffirmed this on cross-examination, further explaining that he had previous experience with the criminal justice system. Blakney also acknowledged having again been advised of his rights on 2 November 1992 and signing a form stating that he understood his rights at that time.

At the suppression hearing, the trial court found with respect to Blakney's statements that

he was not under the influence of any alcoholic beverages at that time; that the defendant was taken to headquarters and he was advised of each of his rights; that the defendant was subdued at that time; he was not . . . in an excited condition; that he was in custody. He was taken to the Salisbury Police Department to an interrogation room; . . . that at that time he was advised of his rights by Detective Rodgers and advised of each of the rights [on the rights form]; that Detective Rodgers asked the defendant if he understood his rights and the defendant acknowledged that he did and that thereafter he signed a waiver of his rights[] [and that] all these had been read to him by Detective Rodgers; and that he agreed to talk with Detective Rodgers without an attorney being present; that the defendant appeared to understand what Detective Rodgers was talking about when he did talk with him; that he appeared to be in touch with his surroundings; that there is no evidence that any threats were made against the defendant by anyone at that time or that any promises were made to him. The defendant thereafter made a statement and that later on November 2, 1992, the [d]efendant, Robert Blakney, was once again questioned by Detective Rodgers and Detective Beck in the Cabarrus County Jail; that prior to questioning they read his rights to him as shown on [the rights form]. The defendant indicated that he did understand his rights and signed a waiver of his rights as shown on [the rights form] . . . . [That] he did complete the eighth grade of school; that he does, in fact, know how to read; that he could read the documents that had been previously referred to . . . ; that he did in fact know what it meant when he read his rights and his waiver of his rights; that the defendant understood that he had a right to talk to a lawyer before he answered any questions on each of these dates; that he knew that he had a right to remain silent on each of those dates; . . . that the defendant knew he didn't have to talk to the officers during the questioning; that on October 30th, the officers went back over with him what they had written down and that the defendant agreed that what they read back to him was right and that was what he had told them and, thereafter, he signed a statement . . . on October 30th, 1992; that on that statement the defendant, in fact, initialed a change that was made on that statement to correct an error which he thought was on the statement[,] which

indicated that he was aware of everything taking place on that day; that on November 2, the defendant basically told the officers the same things he had told them on October 30th in addition to a few questions which were of different things; that there is no evidence of any promises, offers of reward or inducement by law enforcement officers for the defendant to make a statement on either of those dates. . . . [T]here was never any indication by the defendant that he desired to stop talking or that he ever asked for an attorney.

As Blakney has not excepted to any of these findings of fact, they are conclusive and not reviewable on appeal. *State v. Watkins*, 337 N.C. 437, 438, 446 S.E.2d 67, 68 (1994). The trial court's conclusions of law, however, are fully reviewable on appeal and will be upheld if correct when viewed in light of the findings of fact. *State v. McCollum*, 334 N.C. 208, 237, 433 S.E.2d 144, 160 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895 (1994).

Blakney now argues that the totality of the circumstances shows that because of his mental retardation and the circumstances surrounding his statements, he could not have comprehended the *Miranda* warnings as given to him by the officers. This Court has stated that while they are factors to be considered, intoxication and subnormal mentality do not of themselves necessarily cause a confession to be inadmissible because of involuntariness or the ineffectiveness of a waiver. *State v. McKoy*, 323 N.C. 1, 21-24, 372 S.E.2d 12, 23-24 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). We do not believe that these factors as presented by Blakney here are sufficient to render his confession inadmissible. The trial court's thorough findings were amply supported by the evidence presented at the suppression hearing, and the conclusion that Blakney knowingly and intelligently waived his constitutional rights and made the statements voluntarily was a correct conclusion of law in light of the findings. In viewing the findings and conclusions of the trial court, we therefore conclude that the trial court's actions in this regard were not erroneous. This assignment of error is overruled.

[29] In another assignment of error, defendant Blakney argues that the trial court erred by allowing into evidence eighteen photographs that depicted the crime scene. Although Blakney candidly concedes that the photographs illustrated the testimony of investigating officers with respect to the position of the victims' bodies, he argues that the photographs were cumulative and that the State introduced them

only to "inflame the jury's passions." "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). The issues of whether photographs are excessive or repetitive and whether the probative value of photographic evidence is substantially outweighed by the tendency of such evidence to prejudice the jury are within the sound discretion of the trial court. *Id.* at 285, 372 S.E.2d at 527.

We conclude that Blakney has failed to establish that the trial court abused its discretion in admitting the photographs in this case. All eighteen photographs illustrated Agent Bonds' testimony with respect to the nature, number, and location of the victims' wounds. Furthermore, after the admission of the photographs, the trial court specifically noted for the record that it had examined the photographic evidence and determined that the probative value of all the photographs was not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. We also note that during Agent Bonds' testimony, the trial court excluded two of the eighteen exhibits from publication to the jury as duplicative in nature and prohibited the State from introducing two other photographs for presentation to Agent Bonds or for admission into evidence. Because defendant has failed to establish that the trial court abused its discretion with respect to the admission of photographic evidence, this assignment of error is overruled.

## ARGUMENTS OF DEFENDANT CHAMBERS

[30] In another assignment of error, defendant Chambers argues that the trial court erred by allowing Howard Crabb to testify during the sentencing proceeding that Chambers had previously assaulted and robbed Crabb. The State presented Crabb to support the submission of the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance, that defendant had been previously convicted of a felony involving the use or threat of violence to the person. Crabb testified that on 3 June 1992, he was bound, robbed, and severely beaten by an intruder he knew as "Richard Chambers." When asked to identify his assailant in the courtroom, Crabb failed to point to Chambers. However, the State then introduced certified copies of the indictment, transcript of plea, and judgment in which Chambers pled guilty to breaking and entering Crabb's residence on 3 June 1992.

Defendant first argues that Crabb's testimony was insufficient to establish that Chambers was Crabb's assailant since Crabb was unable to either visually identify Chambers in the courtroom or verbally state that Frank Junior Chambers (instead of "Richard Chambers") committed the crime. However, we have previously held that "the most appropriate way to show the 'prior felony' aggravating circumstance would be to offer duly authenticated court records," *State v. Silhan*, 302 N.C. 223, 272, 275 S.E.2d 450, 484 (1981), or to introduce "the judgment itself into evidence," *State v. Maynard*, 311 N.C. 1, 26, 316 S.E.2d 197, 211, *cert. denied*, 469 U.S. 963, 83 L. Ed. 2d 299 (1984). Because the State introduced into evidence certified copies of the transcript of plea and judgment against Chambers for breaking and entering Crabb's residence on 3 June 1992, a proper in-court identification was unnecessary to establish that Chambers committed the prior felony.

In a related argument, defendant contends that the charge of breaking and entering to which he pled guilty was not a sufficient "prior felony" to support the submission of the (e)(3) aggravating circumstance because breaking and entering does not include an element of force or the threat of force against another person. We disagree. In *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), we stated:

> By using "involving" instead of language delimiting consideration to the narrow class of felonies in which violence is an element of the offense, we find the legislature intended the prior felony in N.C.G.S. 15A-2000(e)(3) to include any felony whose commission involved the use or threat of violence to the person. Thus we hold that for purposes of N.C.G.S. 15A-2000(e)(3), a prior felony can be either one which has as an element the involvement of the use or threat of violence to the person, such as rape or armed robbery, *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981), or a felony which does not have the use or threat of violence to the person as an element, but the use or threat of violence to the person was involved in its commission.

*McDougall*, 308 N.C. at 18, 301 S.E.2d at 319. Crabb testified that Chambers entered Crabb's bedroom; bound Crabb's wrists and feet with strips of towels; repeatedly struck Crabb; and eventually stole Crabb's microwave oven, television, VCR, and vehicle. Crabb's testimony was corroborated by photographs illustrating his injuries and by the testimony of Sergeant Steve Whitley regarding his investiga-

tion of the assault on Crabb and the bindings that Chambers used to restrain Crabb during the assault. This evidence, in conjunction with Chambers' guilty plea to breaking and entering, supports the conclusion that violence against Crabb was an integral part of the commission of the breaking and entering of Crabb's residence. Therefore, the trial court did not err by concluding that Chambers' prior conviction for breaking and entering was an appropriate prior felony upon which to submit the N.C.G.S. § 15A-2000(e)(3) aggravator to the jury. This assignment of error is overruled.

[31] In another assignment of error, defendant Chambers contends that the trial court erred in admitting the testimony of four witnesses regarding his release from jail a few hours before the murders were committed. At the outset, we note that Chambers discusses the testimony of two of the witnesses, J.D. Barber and Donna Lowman, but fails to argue against the testimony of Teresa Scott or Greg Pullman. Therefore, the assignments of error relating to Ms. Scott and Mr. Pullman are deemed abandoned. N.C. R. App. P. 28(b)(5).

Chambers argues that the fact that he was incarcerated in the Rowan County jail until approximately 5:00 p.m. on the day of the murders should have been excluded from the evidence because it was irrelevant and highly prejudicial. We disagree.

The evidence involving Chambers' tenure in jail and his release on the day of the murders was relevant under a number of different theories. First, the evidence tended to show that Chambers knew Mr. Tutterow and had targeted him for the robbery. Chambers had met Mr. Tutterow while incarcerated at the Rowan County jail, where Mr. Tutterow cooked part-time and served as a deputy sheriff. Mr. Tutterow was known to carry significant amounts of money in his wallet and had given Chambers money to buy cigarettes and food while he was in jail. This fact helped to establish premeditation and deliberation as well as a motive for the killings: A reasonable inference is that Chambers decided to rob the Tutterows after getting to know Mr. Tutterow and did not want Mr. Tutterow to identify him later on.

Furthermore, the evidence tended to show that Chambers had no money and that he wanted money when he was released from jail. Shortly after his release from jail, Chambers met up with defendant Blakney and Antonio Mason at a nearby convenience store. Chambers told Blakney and Mason that he had been released from jail without any money, that he knew someone who lived nearby who

STATE v. BARNES

[345 N.C. 184 (1997)]

had plenty of money, and that he was willing to kill someone if it was necessary to get some money. Accordingly, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendants bring forward ten additional assignments of error that they concede have been previously decided contrary to their positions by this Court. They raise these issues to give this Court the opportunity to reexamine its prior holdings, as well as to preserve these assignments of error for any potential further judicial review of this case. We have carefully considered the arguments of defendants on these issues and find no compelling reason to depart from our prior holdings. We therefore overrule these assignments of error.

## PROPORTIONALITY REVIEW

[32] Having determined that defendants' trial and separate capital sentencing proceeding were free from error, we now turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstance on which the sentences of death for defendants Barnes and Chambers were based; (2) whether the respective death sentences were entered under the influence of passion, prejudice, or other arbitrary consideration; and (3) whether the respective death sentences are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the individual defendants. N.C.G.S. § 15A-2000(d)(2). After thoroughly examining the record, transcripts, and briefs in the present case, we conclude that the record fully supports the four aggravating circumstances found by the jury with respect to both Barnes and Chambers. Furthermore, we find no indication that the sentences of death in this case were imposed under the influence of passion, prejudice, or any other arbitrary consideration. We therefore turn to our final statutory duty of proportionality review.

Defendants Barnes and Chambers were convicted of two first-degree murders both on the theory of premeditation and deliberation and under the felony murder rule. The jury found four aggravating circumstances as to both Barnes and Chambers: (1) that both Barnes and Chambers previously had been convicted of a felony involving the use or threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) that the murders were committed for pecuniary gain, N.C.G.S.

§ 15A-2000(e)(6); (3) that the murders were part of a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(11); and (4) that the murders were especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). In its recommendations as to punishment for both murders, one or more jurors found the following circumstances to be mitigating with respect to defendant Barnes: (1) when he was young, Barnes observed his mother being abused by his mother's companion; (2) Barnes was constructively abandoned by his parents; (3) Barnes' father was significantly absent from his life and had no significant role in his upbringing; (4) Barnes was adversely affected by the absence and lack of concern of his father; (5) Barnes' mother was convicted of manslaughter when he was three, and he was separated from her two to three years while she was incarcerated; (6) Barnes was adversely affected by the forced separation from his mother during his formative years; (7) Barnes' mother failed to assume the parental role upon her release from prison; (8) Barnes had no significant role models during his formative years; (9) Barnes was a neglected child; and (10) as a result of the factors of his background, Barnes never developed into an adequately adjusted adult. The jurors did not find any mitigating circumstances with respect to defendant Chambers.

In our proportionality review, it is proper to compare the instant case with other cases in which this Court has concluded that the death penalty was disproportionate. *McCollum*, 334 N.C. at 240, 433 S.E.2d at 162. This Court has found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We do not find this case, with respect to either Barnes or Chambers, to be substantially similar to any of those cases.

A number of salient considerations weigh in favor of upholding the death sentences in these cases. We have repeatedly stated that a conviction based upon both the theories of premeditation and deliberation and felony murder is significant, with a finding of the former theory evincing " 'a more calculated and cold-blooded crime.' " *E.g., State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *Lee*, 335 N.C. at 297, 439 S.E.2d at 575), *cert. denied*, —— U.S. ——, 131

L. Ed. 2d 752 (1995). Of the aggravating circumstances found in this case, three of the four—(e)(3), previous felony conviction involving the use or threat of violence; (e)(9), especially heinous, atrocious, or cruel; and (e)(11), course of conduct including other violent crimes— are most often found in death cases upheld by this Court on appeal. *State v. Bacon*, 337 N.C. 66, 129, 446 S.E.2d 542, 577-78 (1994) (Exum, C.J., dissenting), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995). Also, we have noted that the presence of any of these three aggravators is sufficient to sustain a death sentence when only a single aggravator has been submitted to and found by the jury. *Id.* at 110 n.8, 446 S.E.2d at 566 n.8. We also have yet to make a finding of disproportionality in a case in which the jury found the (e)(3) circumstance in recommending a death sentence. *State v. Bishop*, 343 N.C. 518, 560-61, 472 S.E.2d 842, 865 (1996). Furthermore, we have stated that the murder of multiple victims is to be weighed heavily against defendant and that we have never found disproportionate a death sentence imposed in a case involving multiple murders. *State v. McLaughlin*, 341 N.C. 426, 466, 462 S.E.2d 1, 22 (1995), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 879 (1996).

In this case, defendants Barnes and Chambers robbed and viciously murdered two elderly victims. In the course of the murders and the events that followed, Barnes and Chambers showed an utter disregard for the value of human life. While the jury did find a number of mitigating circumstances with respect to defendant Barnes, we cannot say that the death sentences as recommended by the jury and as imposed on defendants Barnes and Chambers by the trial court in this case are disproportionate. The case *sub judice* is therefore distinguishable from the seven cases in which this Court has found the death sentence to be disproportionate and entered a sentence of life imprisonment.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. It also bears mentioning that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say at this time that we conclude that the present case with respect to both Barnes and Chambers is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the death penalty to be disproportionate or those in which juries have consistently returned recommendations of life imprisonment. Accordingly, we conclude that the sentences of death

recommended by the jury for Barnes and Chambers and ordered by the trial court in the present case are not disproportionate.

For the foregoing reasons, we hold that defendants Barnes, Blakney, and Chambers received a fair trial, free from prejudicial error, and that their respective sentences of death or life imprisonment entered in the present case must be and are left undisturbed.

NO ERROR.

Justice FRYE dissenting.

In *State v. Blankenship*, 337 N.C. 543, 447 S.E.2d 727 (1994), this Court held that the trial court erred in its instructions on acting in concert. We held that those instructions were likely to be understood by the jury to permit convicting a defendant of premeditated and deliberate murder, which requires a specific intent to kill, when the only purpose shared between the defendant and the accomplice was to kidnap the victims, and when only the accomplice actually shot and killed the victims with the requisite specific intent to kill. In doing so, this Court resolved an apparent conflict between our opinion in *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987) (holding that although it is not necessary for defendant to be actually present in order to be convicted of premeditated and deliberate murder under the acting in concert theory, the requisite *mens rea* - willfulness, premeditation, and deliberation - must still be shown), and our later decision in *State v. Erlewine*, 328 N.C. 626, 403 S.E.2d 280 (1991) (holding that it was not necessary that defendant share the intent or purpose to commit the crime of assault with a deadly weapon with intent to kill inflicting serious injury before the jury could apply the law of acting in concert to convict the defendant of that crime). Because the decision in *Erlewine* created a possible conflict in the law with the decision in *Reese*, the doctrine of *stare decisis* had no application in *Blankenship*. *See State v. Mobley*, 240 N.C. 476, 487, 83 S.E.2d 100, 108 (1954).

Until today, this Court and, I presume, the lower courts of this State, have followed our opinion in *Blankenship*. This Court followed *Blankenship* last year in a unanimous opinion for the Court written by the Chief Justice, when this Court was presented with instructions identical in substance to those in *Blankenship* and in the instant case. *State v. Straing*, 342 N.C. 623, 466 S.E.2d 278 (1996). That opinion contains, in footnote 1, the following statement: "The author of

**STATE v. BARNES**

[345 N.C. 184 (1997)]

this opinion dissented in *State v. Blankenship*. Although the author of this opinion still believes that *Blankenship* was wrongly decided, he is now required by *stare decisis* to apply that precedent in the case *sub judice*." 342 N.C. at 627, 466 S.E.2d at 280. However, today, the Chief Justice writes for a majority of the Court, ignoring *stare decisis* and overruling a recent opinion of this Court which resolved an apparent conflict in the law by returning to the principles articulated in *Reese*.

As we have said, "[t]his Court has never overruled its decisions lightly. No court has been more faithful to *stare decisis*." *State v. Lynch*, 334 N.C. 402, 410, 432 S.E.2d 349, 352 (1993) (quoting *Rabon v. Hospital*, 269 N.C. 1, 20, 152 S.E.2d 485, 498 (1967)). "This Court has always attached great importance to the doctrine of *stare decisis*, both out of respect for the opinions of our predecessors and because it promotes stability in the law and uniformity in its application." *Wiles v. Construction Co.*, 295 N.C. 81, 85, 243 S.E.2d 756, 758 (1978) (citations omitted).

Although the doctrine of *stare decisis* will not be applied to preserve and perpetuate error and grievous wrong, *see Rabon v. Hospital*, 269 N.C. at 15, 152 S.E.2d at 498, that is not what is involved here. The majority states no good or sufficient reasons for departing from this Court's precedent in *Blankenship* and *Straing*, and I see no new conditions or superior reasoning in the majority's opinion which would justify this Court's ignoring the doctrine of *stare decisis*. A proper regard for *stare decisis* and the adherence to case precedents required by that doctrine compel me to follow the law established in *Reese, Blankenship*, and *Straing*.

The acting in concert instructions in the instant case are identical in substance to *Straing* and, as the majority concedes, are identical in substance to those found defective in *Blankenship*. Nevertheless, today, in this death case, the majority now overrules *Blankenship* and concludes that the trial court's instructions were not erroneous. I believe that *Blankenship* was properly decided and, in any event, I am now required by *stare decisis* to apply that precedent in the instant case. Accordingly, I must register my dissent to this opinion which overrules a case that I thought had settled the law in a manner that was easily understood by our trial court judges.

Justices WHICHARD and PARKER join in this dissenting opinion.